**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Tyrone LeBLANC, Defendant-Appellant.**

**No. 78–5485.**

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 1, 1979.

Decided Jan. 8, 1980.

Rehearing and Rehearing En Banc
Denied April 1, 1980.

Gershwin A. Drain, F. Randall Karfonta, Kenneth S. Sasse, Detroit, Mich., for defendant-appellant.

James K. Robinson, U. S. Atty., William J. Richards, Asst. U. S. Atty., Detroit, Mich., for plaintiff-appellee.

Before ENGEL and MERRITT, Circuit Judges, and CECIL, Senior Circuit Judge.

CECIL, Senior Circuit Judge.

Tyrone LeBlanc and his codefendant, Alan Vester Clinscales, were jointly indicted, each on two counts charging them with two armed bank robberies, in violation of 18 U.S.C., Sec. 2113(a)(d). The first robbery was on August 18, 1977, at the Madison National Bank in Madison Heights, Michigan. A month later, on September 19, 1977, the Warren Bank in Warren, Michigan, was robbed of $114,000. The defendants were tried jointly to a jury and both were convicted on both counts of the indictment.

This is the appeal of LeBlanc from that conviction. The first issue in that appeal involves a procedural question which arose on the first day of trial, in the following manner.

"(Defense Counsel): Your Honor, if the court please, I have a similar motion, (the co-defendant had already made a motion) and I won't make any extensive argument with respect to that.

"I think the court knows the law and the applicable rules. I would only indicate to the court that I have been provided with a rap sheet from Mr. Richards which indicates that my client, Tyrone LeBlanc, has a 1976 charge of larceny from a building, that there is an entry for a conviction of 9/29/76.

"I would further indicate to the court that the defendant was placed on one-year's probation and was given Y.T.A. status, the standard youthful trainee status. And as I understand it, your Honor, it's a situation where a defendant is placed on probation for one year, and at the end of the year, the conviction is set aside.

"As I understand it also, the disposition can occur in one of two ways. Some judges don't require a guilty plea, and I have heard that on occasion, a judge may require a guilty plea and just set it aside.

"In this particular case, I am not—I don't think Mr. LeBlanc really recalls exactly what happened, whether he actually went in court and tendered a guilty plea or whether he was just placed on proba-

tion. The Y.T.A. status is clearly indicated on the rap sheet, and I would submit to the court that as a result of that, the conviction would not be admissible. I don't think from this rap sheet the government can say that a guilty plea was tendered to the court that accepted this Y.T.A. status.

"For that reason, I would ask the court not to permit the government to use that larceny conviction of 1976."

There was argument from the Prosecuting Attorney and the Judge ruled, "Very Well. The ruling of the court is that the '76 larceny conviction may be used for impeachment purposes."

It is claimed on behalf of the appellant that this was error and required him to face a dilemma whether or not he should testify in his own behalf because of the likelihood that cross examination of a prior conviction would cast doubt about the credibility of his testimony.

The government now concedes that the trial judge's ruling was in error. The appellant's assignment to "youthful trainee" status was made pursuant to the Holmes Youthful Trainee Act, Mich.Comp. L.Ann., Section 762.11, *et seq.* Such an assignment does not constitute conviction of a crime within the meaning of Rule 609, Federal Rules of Evidence. Accordingly, under Rule 609, appellant's assignment to youthful trainee status under Michigan law would not be admissible for impeachment purposes as a conviction.

The question before us is whether, under the state of the record, counsel for defendant has preserved his right to predicate error on the trial judge's ruling.

Rule 103, Federal Rules of Evidence, provides:

"(a) Effect of erroneous ruling. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and

"(1) Objection. In case the ruling is one admitting evidence, a timely objection or motion to strike appears of rec-

ord, stating the specific ground of objection, if the specific ground was not apparent from the context; or

"(2) Offer of proof. In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked."

In addition to the above Rule of Evidence, Rule 51, Federal Rules of Criminal Procedure, requires a defendant to make "known to the (trial) court the action which he desires the court to take or his objection to the action of the court and the grounds therefor." In addition, case authority supports the proposition that a defendant must "object with that reasonable degree of specificity which would have adequately apprised the trial court of the true basis for his objection * * *" *United States v. Fendley*, 522 F.2d 181, 186 (5th Cir. 1975). See also *United States v. Bryant*, 480 F.2d 785, 792 (2nd Cir. 1973). Likewise, courts have held that error is not preserved for appellate review when appellant's objection was " 'too loosely formulated and imprecise' to apprise the trial court of the legal grounds for his complaint." *United States v. Arteaga Limones*, 529 F.2d 1183, 1199 (5th Cir. 1976), *cert. den.*, 429 U.S. 920, 97 S.Ct. 315, 50 L.Ed.2d 286 (1976).

With these considerations in mind, it is seen that while possibly the trial judge should have been able to interpret from the statements counsel made in support of his motion that under Michigan law the larceny in which the appellant was involved did not constitute a conviction, counsel did not clearly indicate the point of his motion that the disposition was an adjudication not resulting in a conviction. In addition, he used the word "conviction" four times and there is a question whether he, himself, understood the significance of the Michigan statute.

It is noted that, when the trial reached the stage of case in chief for appellant

LeBlanc, counsel did not renew his motion to deny the right of the prosecutor to cross-examine on the larceny offense under Michigan state law. Neither did he advise the trial judge that his client would not testify on his own behalf because of his ruling on the motion of appellant at the opening of the trial. Nor did he offer the substance of the appellant's testimony in the event that he had testified. See Rule 103(a)(2), Fed.R. Evid. Instead, he stated only that,

"Your Honor, if the court please, on behalf of (defendant), I think we have decided not to present any evidence and would also rest at this time."

Under these circumstances, this Court cannot assume that it was the judge's ruling in question which prevented the appellant from testifying in his own behalf,[1] or that, absent at least a proffer of appellant's proposed testimony, prejudicial error ensued. This is true, especially since the record indicates other tactical reasons why a decision not to testify might have been made.

For example, Jerome Belton, who is alleged to have entered the robbed banks with Clinscales, appellant's co-defendant, testified in the government's case that the appellant was the get-away driver in the two robberies charged in the indictment. He also involved the appellant as being in on the planning of the robberies with him and Clinscales. Belton's testimony was the only direct testimony connecting the appellant in the robberies.

Belton had been separately indicted. He bargained for a plea prior to the time of the trial in this case. Accordingly, he was permitted to plead to one robbery, and was assured that his sentence would not exceed six years and that the charge on one robbery would be dismissed. This was all brought out in the government's case and would naturally subject the witness's testimony to a credibility test. If the jury did not believe his testimony, LeBlanc probably could not have been convicted. It seems

---

1. LeBlanc's co-defendant, Clinscales, did not testify in his own behalf. This may have been jointly planned strategy.

rather obvious that LeBlanc would not want to subject himself to a cross examination of Belton's testimony. In addition, he may have feared the effect of cross examination on the source of the $10,000 in cash which the record indicates he paid for a new automobile, shortly after the second robbery.

We conclude that counsel for appellant did not preserve his right to predicate error upon the trial judge's ruling and that, under a strict application of Rule 103, no substantial right of the appellant was shown to be affected.

Another claim of error on behalf of appellant LeBlanc is predicated on Rule 801(d)(1)(B), Federal Rules of Evidence, and the interpretation of that rule in *United States v. Quinto*, 582 F.2d 224 (2nd Cir. 1978). With regard to this issue, appellant argues that the trial judge erred in permitting the government to use prior consistent statements of the witness Belton on re-direct examination.

The record indicates that, on the day of his arrest, November 7, 1977, Belton was questioned for several hours on the two bank robberies involved in the indictment herein and particularly in an effort to get him to implicate LeBlanc. The two signed statements at issue were made on the day of arrest and before Belton had entered into bargaining for a plea of guilty. The text of these two statements is reproduced and attached as an appendix to this opinion.

Counsel for the appellant cross examined Belton at great length. He brought out testimony from Belton that the officers threatened to prosecute his brother and made promises to him that, if he would implicate LeBlanc, they would release the brother. The following is an excerpt from the record:

Q. "And is that when you implicated Tyrone as the driver in the case?"

A. "No. I didn't implicate Tyrone until they said, 'Well, we'll release your brother for bringing charges to Tyrone.'"

Q. "I see. Okay. And then after they told you that, you decided to implicate Tyrone, is that correct?"

A. "Yes."

This occurred before the statements in question were written and signed.

Counsel for appellant also cross examined Belton at great length concerning his plea bargaining agreement. The majority of the evidence to which Belton testified on cross examination dealt with events occurring after the statements in question were made. The record is as follows:

Q. "Now, let's kind of summarize for just a minute some of the things that you received as a result of your agreeing to testify. Okay."

A. "All right."

Q. "Now, you indicated that you initially agreed that you would receive no more than a six year sentence?"

A. "Right."

Q. "Okay. And you also indicated that at some point in time, somebody also agreed that you would have no more than an 18 month sentence?"

A. "Right."

Q. "Do you recall that?"

A. "Yes."

 * * * * * *

Q. "Now, it was also agreed that the government would not oppose any civil action to get your car?"

A. "Right."

Q. "Your bond was continued on a personal bond as a result of your cooperation?"

A. "Yes."

Q. "Is that right?"

A. "Right."

Q. "And at some point in time, your bond was also reduced from a $3,000 —excuse me—from a $30,000 10% bond to a personal bond, is that correct?"

A. "Correct."

Appellant's counsel, himself, however, referred the witness Belton to his statements at issue and based the following questions of his examination on them:

Q. "Let me ask you to go over them. (The statements) And I am going to ask you again if the statements in there are true or untrue, particularly the statements that refer to Tyrone LeBlanc."

A. "Some of it is true and some of it isn't."

Q. "The part that relates to Tyrone LeBlanc, is that true or untrue?"

A. "Talking about the part I said I didn't know how he got to the lumber yard?"

Q. "I'm talking about all you say about Tyrone LeBlanc, is that true or untrue?"

A. "It's true."

Q. "You are saying it's true?"

A. "Yes."

Q. "You're saying that Tyrone LeBlanc participated in that robbery with you?"

A. "Yes."

On re-direct examination, counsel for the government requested the witness to read the statement marked as government's proposed exhibit 62, marked for identification only. This was the statement of the witness Belton on the robbery of the Madison National Bank in Madison Heights, Michigan.

Counsel for appellant. "I object to his reading from the statement. It's not an exhibit that has been introduced in evidence yet, and I think for that reason it shouldn't be read by this witness."

Counsel for the government argued that: " * * * the reason for not introducing it as an exhibit * * * is that that would put, if received * * * the exhibit in the jury room and would perhaps give undue emphasis to that portion of the testimony."[2]

The government argues that Belton could properly read the statement as substantive evidence pursuant to Rule 801(d)(1)(B), Federal Rules of Evidence. Rule 801 provides:

"Statements which are not hearsay. A statement is not hearsay if—

(1) Prior statement by witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is (A) * * * (B) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive * *."

In response to the government's specific argument to the trial court that Belton could properly read the statement pursuant to this rule, counsel for appellant again stated:

"That rule doesn't relate to documents or exhibits, and that is a proposed exhibit. It is a written statement, and it's not just the verbal expression of a witness. And for that reason, I don't think that 801 actually covers that situation."

The trial judge ruled that it might be read as a prior consistent statement. Subsequently, the witness read his statement concerning the robbery of the Warren bank. No further objection was made to the reading of this statement.

Counsel for appellant argues to this Court that Rule 801(d)(1)(B) was not applicable to the facts of this case. He claims that Belton's testimony with reference to the promise to release his brother for testimony implicating LeBlanc was given before the statements were made. Therefore, the statements were given after Belton had been given a motive to fabricate. As the record indicates, this argument now made to our Court was not advanced to the trial court at the time the statements were read.

■ We conclude that counsel, on behalf of the appellant, did not preserve any right to predicate error on the trial court's ruling for the reason that he did not object to the

---

**2.** In *United States v. Quinto, supra,* the court found it significant that the challenged statement was allowed to go into the jury room.

use of the statements on the ground he now relies upon in this appeal.[3]

■ Even considering the merits of the argument, it is seen that the facts of this case distinguish it from *United States v. Quinto, supra,* upon which defendant relies. First the statements were only read by the witness Belton, not allowed to go to the jury room during its deliberations. Secondly, defendant himself elicited the use of the statement on re-direct examination by his reference to them of the witness on cross-examination. Further, throughout the trial, counsel argued, by inference, that Belton should not be believed because of the favorable consideration he received from the government in his plea bargaining agreement. In his opening argument, counsel stated that Belton had never provided favorable information to the government until he had been charged and negotiated the plea bargaining agreement in return for his testimony. In view of this, Belton's statements would be admissible as prior consistent statements which predated the plea bargaining agreement.

Further, as we have heretofore quoted from the record, counsel, himself, on cross examination, elicited the most incriminating portion of Belton's statements—those dealing with appellant's participation in the robberies—even before the government sought to use the statements as prior consistent statements. Thus, if there were any error in admitting the reading of the statements, it would be harmless error beyond a reasonable doubt.

We conclude that the trial judge was not in error in permitting the reading of the statements.

Judgment affirmed.

### APPENDIX

The first statement Belton signed on the date of his arrest:

"Regarding the bank robbery of the Madison National Bank, Madison Heights, Michigan, on Thursday, August 18, 1977, Tyrone LeBlanc and I have been good friends for years. I have known Al Clinscales for two or three years. Al lives at 16661 Fitzgerald in Ferndale. Al set up this bank robbery.

"In the late morning of August 18, 1977, Al and Tyrone came to my house and picked me up. Al and I drove to the vicinity of the bank in a 1973 gold Chevrolet 4-door hard top, brown moulding on the sides. Tyrone followed us to the bank in a solid blue 2-door Chevrolet, white leather interior. We switched cars at the shopping center. Neither Tyrone nor myself had a gun. Al had a rifle which he concealed under his coat. Al and I drove around the bank several times looking it over and then drove the blue Chevrolet into the restaurant parking lot in the back of the bank. I entered the bank first and Al followed me.

"I vaulted the counter and was the one next to the girl in the drive-in window. I took all the money out of the drive-in window drawer and took all of the money from another drawer which another teller took out. Al did not vault the counter.

"We then departed in the blue Chevrolet and Al dropped me off at the shopping center and I got in on the floor of the gold Chevrolet. The reason Tyrone was there because of his short hair and they would not be looking for someone as presentable looking as Tyrone. According to Al's instructions, we went to Tyrone's house where Al called about one hour later.

"I had all the money in the bag. After the phone call, we all met at a motel at Warren and Livernois or Michigan and Livernois in an upstairs room. We split the money three ways about $1,300 a piece (sic). The total loot was about $3,900. Al told me later he threw the gun away.

"In the bank, Al was the person who did the talking and had the gun."

(T.T. 535–537; App. 110–112)

The second statement Belton signed on the date of his arrest:

**3.** Rule 103(a)(1), Federal Rules of Evidence.

"Regarding the September 19, 1977 bank robbery of the Warren bank, Ten Mile and Schoenherr in Warren, Michigan.

"About a week before the bank robbery, Alan Clinscales described the bank to myself and Tyrone LeBlanc.

"All three of us drove to the bank the Saturday before the bank robbery.

"Al instructed me to put a Temporarily Closed sign on the drive-in window after we entered the bank. He said he was going to get full control of the bank. Tyrone was going to stay in a lumberyard on Schoenherr toward Eight Mile on the left side of the street driving from the bank. Tyrone was to drive me away from the bank after the bank robbery.

"At about 11:00 a. m. on the date of the bank robbery, Tyrone and Al picked me up at 11:00 a. m. at my house. They dropped me off at the Burger King at Groesbeck and Eight Mile and left me.

"They had a 1977 Chrysler 4-door navy blue. Al came back for me in the Chrysler and we drove for about one-half hour for traffic to clear. Tyrone was to be sitting in a solid green Ford or Mercury 1975–1976 in the lumberyard. I don't know how he got there. I don't know how the green car was obtained for Tyrone. Al got all of the cars. After Al picked me up, we drove around the vicinity of the bank and waited for traffic to clear before we went inside the bank. After parking at a side road near the bank, Al went in the bank first and he had a rifle under his coat. I put a closed sign in the drive-in window. Al stayed in the center of the bank and covered the employees with the rifle. I cleaned our (sic) four drawers and Al the rest of the bank. Al put all the bank employees in the room before we left the bank.

"We walked to our car on the side street and drove to the lumberyard where I got in the car Tyrone was driving, the green car. Al had all the money in a bag.

"Al met us about one hour later in the Crystal House Motel at Eight Mile and Greenfield on the second floor. We had split the money three ways. Al kept the remaining $100,000. Al gave me another $3,000 which I purchased a cashier's check from Manufacturer's National Bank at Eight Mile and Schaefer. Al gave me another $3,000 cashier's check plus some cash $1,000 or slightly more. This money was used to purchase my new Cadillac." (T.T. 538–540; App. 113–115)