NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0098n.06

Case No. 24-3390

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | **FILED**<br>Feb 20, 2025<br>KELLY L. STEPHENS, Clerk |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO |
| | ) | |
| ALEX JAQUES, | ) | |
| Defendant-Appellant. | ) | |
| | ) | O P I N I O N |

Before: THAPAR, NALBANDIAN, and DAVIS, Circuit Judges.

**NALBANDIAN, Circuit Judge.** Alex Jaques took to YouTube to threaten a school shooting. After users reported him to the FBI, law enforcement searched his home and found a small arsenal of weapons, including an illegal submachine gun. Jaques pleaded guilty to unlawful possession of a machine gun and agreed to an advisory-Guidelines range of 30 to 37 months' imprisonment. At sentencing, the court heard from two psychologists about Jaques's fixation with firearms and pattern of violent activity. Based on Jaques's long history of violent commentary both pre- and post-arrest, the district court sentenced Jaques to 72-months' incarceration followed by three years of supervised release.

Jaques claims the sentence was unreasonable for two reasons: first, the court impermissibly relied on rehabilitation to impose the sentence and second, the sentence is longer than necessary to meet the statutory purposes of sentencing. Finding neither argument persuasive, we affirm.

**I.**

Alex Jaques's YouTube channel "Guns and Film" catalogs his longstanding fixation with firearms and violence. This case involves a September 30, 2022, video he posted called "Torture testing a Chromebook (Washington Middle School)." In the video, his camera focused on a Google Chromebook with a Washington Middle School sticker prominently displayed on it. Jaques explained his plans to "torture test[]" the school laptop and noted his "plan to eventually return" to the school and "fill out [his] list of duties." R.27, Plea Agr., p.7, PageID 91. He added that he had a list of names and addresses of people who had wronged him throughout the years and then stabbed the laptop with a screwdriver several times and drilled it with a power drill. Two firearms are visible in the video. Jaques then picked up a third firearm, moved to the basement, and said "Washington Middle School you are next." *Id.* He fired a single shot at the laptop with what appeared to be a handgun before picking up a 9-millimeter Uzi-style submachine gun and firing multiple shots in rapid succession at the laptop. He later fired a rifle at the laptop several times.[1]

Jaques kept the video on his YouTube channel for several months, alongside other videos depicting his gun use. But he did not only use the page to post videos; he also interacted with other videos. In November 2022, he commented that "[b]ullies [sic] families get their final say in court" on a publicly available video of survivors from the 2018 Stoneman Douglas Highschool shooting in Parkland, Florida giving their victim impact statements in open court. *Id.* at p.8, PageID 92. His comment drew backlash from other viewers. To these Jaques replied: "I will do

---

[1] Washington Middle School is in Salinas, California near where Jaques grew up. He apparently didn't attend the school though his sister did. Jaques later moved to Ohio.

my own parkland." *Id.* After seeing this exchange, someone checked out Jaques's YouTube page, saw the "Torture Testing" video, and reported him to the FBI.

That month, law enforcement executed a search warrant on Jaques's home and seized nineteen items, including nine guns, ammunition, homemade suppressors, a hand grenade and grenade fuses, and makeshift parts for a rocket launcher. Among these was the submachine gun that appeared in the "Torture Testing" video. Jaques was initially indicted under 18 U.S.C. § 875(c) for making interstate threats. But under a plea agreement, Jaques pleaded guilty to one count of possession of a machine gun in violation of 18 U.S.C. § 922(o). And as part of his plea, he agreed to an adjusted offense level of nineteen, including a four-point increase for use of a firearm in connection with another felony (interstate threats). He also agreed to a criminal-history score of one. Based on that, the agreement stipulated an advisory-Guidelines range of 30 to 37 months.

To aid in sentencing, the court referred Jaques for a psychological evaluation. And in August 2023, the court held Jaques's first sentencing hearing. At the hearing, Jaques's counsel acknowledged Jaques "ha[d] been his own worst enemy through his impulsivity." R.54, Sentencing Hr'g Tr., p.7, PageID 395. And he admitted that Jaques "does need to address his mental health," that he "needs to be in therapy," and that he "needs to be on medication." *Id*. at p.11, PageID 399.

The government agreed and hoped it was true that Jaques had finally accepted his need for mental healthcare, despite earlier indications to the contrary. *Id*. at p.17, PageID 405. But the government also highlighted Jaques's pattern of fixation with violence both before and after arrest. As a teen, Jaques received a juvenile adjudication relating to an explosive device and was expelled from his high school for racist drawings and drawings of guns. As a young adult, Jaques pistol-

3

whipped a dog, causing his mother and minor sister to move out of their family home out of concern, leaving him living there alone. After he married, his wife moved into the home with him and asked him to stop shooting guns in the basement or she would tell his mom. So he threatened to kill her pet rabbits and told her he "d[id]n't like snitches." *Id.* at p.20, PageID 408. He later recounted these incidents in a letter to his friend, which the government presented at sentencing.

The government also highlighted Jaques's YouTube channel. In one video, Jaques's friend drove a car while a laughing Jaques shot at street signs through the window. The next video he posted was the "Torture Testing" video. And after that he posted a montage of clips of him using guns set to music, including a clip of him shooting a rabbit and zooming in repeatedly on its dead face.

The government also presented text messages between Jaques and his friends. In October 2022, Jaques's friend texted him that the police were looking for him. Jaques replied that the police will never find him, and "[i]f they do, they're getting an Uzi to the face." *Id.* at p.24, PageID 412. Jaques also had text messages with a friend explaining that the 1999 Columbine High School massacre would have "been cooler" if the killers had more powerful weapons. *Id.*

Finally, the government showed that Jaques's violent commentary did not end after his arrest in November 2022. In a jail call with his wife in January 2023, she described her love for rabbits and noted that seeing rabbit meat made her sad. Jaques responded, "what if we sold the repackaged meat not just of [] children, but of children killed in mass shootings." *Id.* at p.28, PageID 416. He also wrote her a letter saying "everybody severely underestimates my lethality, which is the goal. I don't want the judge or prosecutor to catch wind of what I'd be willing to do if I am backed into a corner. If I shoot, it's to kill." *Id.* at p.32, PageID 420. And in a letter to a friend, he said he saw news of two reporters being gunned down in Florida. He continued to say:

"Today was a good day. I hope their families choke . . . I should send the guy who shot the reporters a care package." *Id*. at pp.29–30, PageID 417–18. A few weeks later, he expressed frustration during a video call with his grandmother that the prison would not let him attend a family member's funeral, saying: "How am I not going to kill someone for those stupidities? I wasn't dangerous before but now I am." *Id*. at p.31, PageID 419.

The government ended by explaining that Washington Middle School—the subject of Jaques's "Torture Testing" video—had to hire extra armed security guards and implement new security procedures. *Id*. at p.34, PageID 422.

After hearing this evidence, the court concluded Jaques's first psychological evaluation was insufficient. It determined that the evaluator did not have enough time to "adequately judge [Jaques's] dangerousness [or] potential dangerousness." *Id*. at p.43, PageID 431. So it referred Jaques to a Federal Medical Center for another evaluation and report.

In February 2024, another evaluator testified about her assessment of Jaques. She described his behavior as "very concerning because it is suggesting that he does have violent intentions." R.65, Hr'g Tr., p.19, PageID 694. And in response to the idea that he was just joking, she said: "I think that Mr. Jaques was aware that he was being monitored. He was aware that the judge was concerned about his risk for future dangerousness, and so the explanation that what he was saying could be a joke . . . really does not allay my concerns." *Id*. at p.20, PageID 695.

The evaluator also administered a Violence Risk Appraisal Guide-Revised assessment of Jaques. She placed him in the fourth of nine risk categories, giving him a roughly twenty percent chance of reoffending violently within five years post-release and a roughly forty-two percent chance of reoffending violently within twelve years. She was unable to diagnose Jaques with

antisocial personality disorder. But in response to a question from the court, she confirmed that he would benefit from long-term consistent treatment in a structured environment.

In March, the court reconvened for another sentencing hearing. The court heard argument from Jaques's counsel and the government as well as an allocution from Jaques. The court then explained that the "advisory sentencing guideline range of 30 to 37 months catastrophically underestimates the seriousness of [Jaques's] conduct and the likelihood of recidivism." R.66, Sentencing Hr'g Tr., pp.32–33, PageID 779–80. So the court notified the parties of its intent to vary upward and gave the parties two weeks to prepare argument.

When the parties returned, Jaques's counsel expressed concern that Jaques would likely be placed in a high-security prison facility where he would be one of the youngest prisoners and would be 800 miles from his family.[2] Jaques also had sexual-assault allegations on his record that may make him a target for violence by other prisoners. The government agreed that this was not an ideal placement for Jaques and the court called for another hearing to better consider the issue. At that hearing, former Bureau of Prisons officials testified about where Jaques might be placed and what the court could do to improve his placement. The court adopted changes to the presentence report to help ensure Jaques was placed in a medium-security facility. The court acknowledged that a high-security facility, where Jaques was at risk of violence by the other prisoners, "would be more punishment than was needed to carry out the purposes of sentencing." R.68, Sentencing Hr'g Tr., p.60, PageID 892.

The court then proceeded to sentencing. As agreed to by the parties, the court calculated a net offense level of nineteen with a Guidelines range of 30 to 37 months. The court then walked through Jaques's various violent statements, past actions, and online activity as presented by the

---

[2] Jaques was 21 years old at the time of his arrest.

government. It explained how Jaques's activity could embolden other violent actors in the current "era of copycat crimes" and forced the Washington Middle School to take added security measures. *Id*. at p.64, PageID 896.

Turning to the 18 U.S.C. § 3553(a) factors, the court discussed Jaques's need for therapy and counseling but admitted that it "can't control [him] beyond the period of his supervised release." *Id*. at p.68 PageID 900. The court then again outlined Jaques's continued violent commentary while in custody and quoted one of Jaques's psychological evaluators finding that "the callous nature of Mr. Jaques'[s] thinking . . . raises more concerns about [his] dangerousness potential." *Id*. at p.70, PageID 902. The court reiterated the evaluator's finding that Jaques presents a moderate risk of future violent recidivism. Finally, the court noted the "undoubtedly serious" nature of Jaques's crime, the Bureau of Prisons' ranking of the crime as one of "high severity," the "small arsenal of weapons" Jaques kept in his home, and the fact that Washington Middle School had to spend thousands of dollars on security to protect itself from Jaques's threat. *Id*. at p.77, PageID 909. For these reasons, the court concluded "Jaques is at this moment a danger to the community." *Id*.

Considering the fair punishment prong of § 3553(a), the court again explained that the Guideline's range was insufficient. The court "considered the need for both specific and general deterrence." *Id*. at p.79, PageID 911. For specific deterrence, the court feared that once "the structure" of court supervision was removed it has "no confidence that [Jaques would] continue his therapy which . . . is the best way to guarantee the safety of the community." *Id*. at p.79, PageID 911. For general deterrence, the court noted the "robust market" for the "garbage" Jaques put online. *Id*. So the court concluded that Jaques "is a danger to the safety of the community, that fair punishment is not satisfied by a Guidelines sentence, that deterrence in Mr. Jaques's case

deserves a harsher sanction than the Guidelines provide, and that rehabilitation is not as easy to order and see followed [in this case] as i[n] most situations." *Id*. at p.81, PageID 913. The court stated that "this is a different type of illegal possession-of-a-machine-gun case." *Id*.

The court also explained that it would "like to prescribe a number of things that Mr. Jaques can do to get his life on the right track," including "long periods in therapy." *Id*. at p.80, PageID 912. And said it would "order that for as long as my jurisdiction lasts," acknowledging that "when [Jaques] is no longer on supervised release" the court "cannot promise that he will maintain his therapy." *Id*. With that, the court sentenced Jaques to 72 months' incarceration followed by three years of supervised release. *Id*. at pp.81–82, PageID 913–14. The court recommended a medium security prison as discussed with the parties. *Id*. at p.85, PageID 917. It also recommended that, while incarcerated, Jaques "be exposed to [therapy] programming" and "receive a mental health assessment and treatment." *Id*. at pp.85–86, PageID 917–18.

Among other things, the court conditioned Jaques's supervised release on his obtaining a mental health assessment and attending whatever therapy that assessment required. *Id*. at pp.82–83, PageID 914–15. The court also made recommendations to the Bureau of Prisons as to what facility Jaques should be sent to and his access to certain mental health services. *Id*. at pp.85–86, PageID 917–18. At the conclusion of the hearing, the court asked for any procedural or substantive objections to the court's sentence. *Id*. at p.86, PageID 918. And Jaques's counsel objected substantively to the sentence imposed as greater than necessary but made no procedural objections. *Id*. Jaques appealed.

He raises two issues. First, he claims that the district court impermissibly relied on rehabilitation in imposing his sentence. Second, he argues his sentence was longer than necessary to meet the statutory purposes of sentencing.

**II.**

Jaques's first claim is that the district court relied on an impermissible factor (rehabilitation) at sentencing in violation of *Tapia v. United States*, 564 U.S. 319 (2011). The parties dispute what standard of review should apply to this claim. The government contends that a *Tapia* error is procedural and must be raised at sentencing. Because Jaques did not raise the issue below, the government argues that we should review for plain error. Jaques, on the other hand, says that a *Tapia* error is substantive and need not be raised below to be preserved. In that case, we would review for abuse of discretion.

**A.**

In general, we review both procedural and substantive sentencing errors for an abuse of discretion. *Gall v. United States*, 552 U.S. 38, 51 (2007). But depending on which type of error is alleged, we may or may not require a contemporaneous objection at sentencing to preserve the issue for appellate review. We review a procedural error that is not raised for plain error.

It's true, the line between "procedural" and "substantive" errors can be "blurry, and the analysis often overlaps." *United States v. Small*, 988 F.3d 241, 258 (6th Cir. 2021). But our cases offer some guidance to distinguish between them. Take procedural reasonableness first. These errors are typified by a district judge's failure to calculate or improper calculation of the Guidelines range, failure to treat the Guidelines as advisory rather than mandatory, failure to apply the § 3553(a) factors, or failure to "adequately explain the chosen sentence." *Gall*, 552 U.S. at 51. These requirements are "process-driven" and ensure that the judge correctly established the sentencing framework before explaining the particulars of a defendant's sentence. *United States v. Rayyan*, 885 F.3d 436, 440 (6th Cir. 2018).

Procedural errors are also generally "apparent as soon as the court finishe[s] announcing its proposed sentence." *United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (en banc) (internal quotation marks omitted). For this reason, they can easily be raised in front of the district judge for further clarification. Raising objections at sentencing allows for the judge closest to the facts to readily resolve the claimed error. *Id.* at 391. These objections also improve our appellate review: we have a cleaner record because the judge must, in the first instance, clarify his rationale to resolve the objection. *United States v. Bostic*, 371 F.3d 865, 871 (6th Cir. 2004). For these reasons, we require a contemporaneous objection to preserve such issues. And without one, we apply plain error review on appeal. *Vonner*, 516 F.3d at 386.

Substantive reasonableness is different. This is an argument that "a sentence is too long (if a defendant appeals) or too short (if the government appeals)." *Rayyan*, 885 F.3d at 442.[3] Whether the judge considered a given factor (or relied on an impermissible one), is not the concern—"that's the job of procedural unreasonableness." *Id.* Instead, substantive reasonableness contemplates the "totality of the circumstances," *Gall*, 552 U.S. at 51, and whether the sentence was "sufficient, but not greater than necessary" under § 3553(a), *Vonner*, 516 F.3d at 391 (internal quotation marks omitted).

When a defendant advocates for a particular sentence before the trial court, he is effectively communicating his view that a longer sentence would be "greater than necessary," and thus

---

[3] The Second Circuit has offered helpful context on how substantive errors differ from procedural ones. As they explain, the standards relevant to substantive reasonableness operate as a "backstop for those few cases that, although procedurally correct, would nonetheless damage the administration of justice because the sentence imposed was shockingly high, shockingly low, or otherwise unsupportable as a matter of law." *United States v. Rigas*, 583 F.3d 108, 123 (2d Cir. 2009) (citing *Rita v. United States*, 551 U.S. 338, 365 (2007) (Stevens, J., concurring) ("[A] district judge who gives harsh sentences to Yankees fans and lenient sentences to Red Sox fans would not be acting reasonably even if her procedural rulings were impeccable.")).

substantively unreasonable. *Id.* So we don't require an additional, contemporaneous objection to preserve a challenge to the substantive reasonableness of a sentence because he has already "informed the court of the legal error." *Holguin-Hernandez v. United States*, 589 U.S. 169, 175 (2020); *see also United States v. Solano-Rosales*, 781 F.3d 345, 356 (6th Cir. 2015). By logical extension, substantive errors are not subject to plain error review. *Id.* at 355–56; *Gall*, 552 U.S. at 51.[4]

The question is how to characterize a *Tapia* violation—procedural or substantive? A judge who commits a *Tapia* violation, in effect, considers a sentencing factor that he shouldn't. And although considering an "impermissible factor" at sentencing more naturally appears procedural, we have characterized reliance on an "impermissible factor" as both procedural and as substantive.[5] So not surprisingly, we have also treated *Tapia* claims inconsistently. *See, e.g.*,

---

[4] A sentence imposed after the revocation of supervised release is subject to these same principles and standards of review. *United States v. Deen*, 706 F.3d 760, 762–63 (6th Cir. 2013).

[5] Our precedents are muddled on whether a district judge's consideration of an "impermissible factor" is procedural or substantive. *See, e.g.*, *United States v. Morris*, 71 F.4th 475, 481–82 (6th Cir. 2023) (procedural); *United States v. Mitchell*, 107 F.4th 534, 540 (6th Cir. 2024) (same); *United States v. Tellez*, 86 F.4th 1148, 1153 (6th Cir. 2023), *cert. denied,* 144 S. Ct. 1083 (2024) (same). *But see United States v. Benson*, 591 F.3d 491, 500 (6th Cir. 2010) (substantive); *United States v. Price*, 901 F.3d 746, 749 (6th Cir. 2018) (same). And we have recognized that inconsistency. *United States v. Fowler*, 956 F.3d 431, 440 n.1 (6th Cir. 2020) (collecting cases and noting that "[t]his issue is ripe for en banc review").

The confusion is likely in part because we have never formally defined what an "impermissible factor" is. *United States v. Cabrera*, 811 F.3d 801, 808 (6th Cir. 2016). But examples abound. They include a district judge's reliance on a protected trait (like race or sex). *United States v. Riley*, 785 F. App'x 282, 286 (6th Cir. Aug. 14, 2019). Or increasing a sentence based on a defendant's willingness to exercise his Fifth Amendment rights at trial. *Cabrera*, 811 F.3d at 808. Rehabilitation falls into this same category. A court's reliance on it cannot justify a particular sentence because it does not serve the purposes of § 3553(a). And as *Gall* explained, procedural errors concern the structural components used to reach the sentence itself and the relationship between the imposed sentence and the Guidelines range. 552 U.S. at 51. Reliance on an impermissible factor—rehabilitation or otherwise—is just that and should be evaluated as a procedural error.

*United States v. Parrish*, 915 F.3d 1043, 1047 (6th Cir. 2019) (procedural); *United States v. Deen*, 706 F.3d 760, 762–63 (6th Cir. 2013) (substantive). In other cases, we have declined to ground *Tapia* in our procedural-substantive dichotomy. *See, e.g.*, *United States v. Krul*, 774 F.3d 371, 374 (6th Cir. 2014). But we have repeatedly acknowledged the inconsistency. *See, e.g.*, *United States v. Goode*, 834 F. App'x 218, 222 (6th Cir. 2020). And we have yet to resolve the issue. *United States v. Whitlock*, No. 22-1821, 2024 U.S. App. LEXIS 3070, at *3–4 (6th Cir. Feb. 8, 2024).

Our failure to categorize *Tapia* claims as procedural errors that are subject to plain error puts us out of step with (quite literally) every other circuit. *United States v. Rand*, 93 F.4th 571, 578–79 (1st Cir. 2024) (analyzing *Tapia* error as procedural and applying plain error); *United States v. Lifshitz*, 714 F.3d 146, 149–50 (2d Cir. 2013) (same); *United States v. Bennett*, 698 F.3d 194, 200 (4th Cir. 2012) (same); *United States v. Burrows*, 905 F.3d 1061, 1066–67 (7th Cir. 2018) (same); *United States v. Clark*, 998 F.3d 363, 368–69 (8th Cir. 2021) (same); *United States v. Grant*, 664 F.3d 276, 279 (9th Cir. 2011) (same); *United States v. Thornton*, 846 F.3d 1110, 1112–13 (10th Cir. 2017) (same); *United States v. King*, 57 F.4th 1334, 1340 (11th Cir. 2023) (same); *United States v. Culbertson*, 712 F.3d 235, 243 (5th Cir. 2013) (analyzing *Tapia* claim under plain error); *United States v. Schonewolf*, 905 F.3d 683, 693–94 (3d Cir. 2018) (same). *But see United States v. Zabielski*, 711 F.3d 381, 390 (3d Cir. 2013) (analyzing preserved *Tapia* claim for substantive reasonableness).

The Supreme Court's precedents point in the same direction. Though it has not resolved the question directly, it has twice implied *Tapia* violations are subject to plain error. First, in *Tapia* itself, the Court left the courts of appeals to "consider the effect of Tapia's failure to object" at sentencing. *Tapia*, 564 U.S. at 335 (citing Fed. R. Crim. P. 52(b) and *United States v. Olano*, 507 U.S. 725, 731 (1993)).

Second, in *Henderson v. United States* the Court implicitly endorsed plain-error review of *Tapia* claims. 568 U.S. 266 (2013). *Henderson* addressed whether "plainness" for plain-error review was determined at the time of appellate review or at the time of the district court's error. *Id.* at 268. The merits of the case concerned a sentencing proceeding that had taken place before *Tapia* and the appeal that had taken place after. Though counsel did not object at sentencing, the Court concluded that "plainness" was evaluated at the time of appeal and remanded for further, consistent proceedings. If *Tapia* violations are not subject to plain error, then the Court neither could have resolved the larger plain-error question, nor could it have vacated the Fifth Circuit's earlier conclusion that the error was not "plain." *Id.* at 279.

Several of our cases have also highlighted that *Henderson* undermined our approach to *Tapia* errors. *United States v. Coffelt*, 529 F. App'x 636, 640 (6th Cir. 2013) (subjecting *Tapia* claim to plain error in light of *Henderson*, without calling it procedural); *Krul*, 774 F.3d at 381 (Griffin, J., concurring in the judgment) (questioning the practice of calling *Tapia* violations substantive in light of *Henderson*); *United States v. Green*, 588 F. App'x 453, 455 (6th Cir. 2014) (acknowledging *Henderson*); *United States v. Frost*, 770 F. App'x 744, 745 (6th Cir. 2019) (same).

So while it's true that some of our cases have viewed *Tapia* violations as substantive, the approach of other circuits to view them as procedural and the implicit endorsement of that approach by the Supreme Court casts an increasingly long shadow over that conclusion. And as far as our larger jurisprudence about impermissible factors, it strikes us as a necessary conclusion that the correct view is that *Tapia* violations are procedural, so subject to forfeiture and plain error.

This case exemplifies why *Tapia* errors should be viewed as procedural. The judge asked counsel whether he had "any procedural or substantive objections" to the sentence, and he responded: "Jaques would respectfully object substantively to the sentence imposed as being

13

greater than necessary to carry out the [] sentencing factors. I don't believe there's any procedure objections." R.68, Sentencing Hr'g, p.86, PageID 918. If counsel had concerns that the judge's justification for the sentence had impermissibly relied on rehabilitation, this was an apt moment to raise the objection. Had he, the district court could have clarified its sentencing rationale. This explanation would have either eliminated any ambiguity in his rationale (and perhaps any need for appeal), or would have expressly clarified his reliance on rehabilitation, making our appellate review straightforward.

Instead, Jaques's counsel focused his objection on the length of the sentence, not on the rationale. Counsel's burden is to "object with that reasonable degree of specificity which would have adequately apprised the trial court of the true basis for his objection." *Bostic*, 371 F.3d at 871 (quoting *United States v. LeBlanc*, 612 F.2d 1012, 1014 (6th Cir. 1980)). Objecting generally to the substance of the sentence does nothing to notify the district judge of the true issue—counsel's belief that the judge relied on an impermissible factor. This general-substantive objection did not afford the court the opportunity to clarify its rationale and is precisely why we apply plain-error review when an objection is made at "such a high degree of generality." *United States v. Simmons*, 587 F.3d 348, 356–58 (6th Cir. 2009).

For these reasons, *Tapia* violations are procedural and subject to plain-error review. We should join the rest of the circuits who hold as much. Still, under either standard of review Jaques's claim fails because there was no *Tapia* violation.

**B.**

In deciding whether, and for how long, to sentence a defendant to imprisonment, a district court must "consider the factors set forth in section 3553(a) to the extent that they are applicable, *recognizing that imprisonment is not an appropriate means of promoting correction and*

*rehabilitation*." 18 U.S.C. § 3582(a) (emphasis added). In *Tapia*, the Supreme Court clarified that this language "precludes sentencing courts from imposing or lengthening a prison term to promote an offender's rehabilitation." 564 U.S. at 332. There, the lower court made clear it selected a specific length of imprisonment to ensure the defendant had time to complete a specific drug-rehabilitation program. *Id.* at 334. But *Tapia* made clear that not every reference to rehabilitation is improper: "A court commits no error by discussing the opportunities for rehabilitation within prison or the benefits of specific treatment or training programs." *Id.* Lower courts are also allowed to consider the availability of rehabilitative programs when suggesting a particular facility and make recommendations to the BOP accordingly. *Id.* And a sentencing judge may consider the defendant's need for "educational or vocational training, medical care, or other correctional treatment" when imposing terms of punishment other than imprisonment, such as supervised release. *Krul*, 774 F.3d at 374 (internal quotation marks omitted).

So in reviewing for a *Tapia* violation, we ask if the defendant's rehabilitation was "the reason" the sentencing court assigned the defendant a specific term of imprisonment. *Deen*, 706 F.3d at 768; *see also United States v. Gesing*, 599 F. App'x 238, 239 (6th Cir. 2015). The court need not explicitly disavow rehabilitation. *Krul*, 774 F.3d at 375. And likewise, reversal is not required "whenever it is *merely possible* that rehabilitation drove the length of imprisonment." *Id.* (emphasis added). Finally, we will distinguish between a judge's comments that "address the overall sentence, and not just incarceration" from those providing a rationale for the term of imprisonment itself. *Id.* at 374.

The district court here did not violate *Tapia*. Jaques points to the court's discussion of his need for therapy and a structured environment as evidence that his term of imprisonment was based on rehabilitative concerns. We disagree. For one, *Tapia* does not prevent the court from discussing

how mental health programs would help Jaques. 564 U.S. at 334. And the court was permitted to consider rehabilitation when deciding on Jaques's conditions for supervised release. *Krul*, 774 F.3d at 374. The court repeatedly highlighted that it could only mandate that Jaques attend therapy for as long as he was on supervised release. R.68, Sentencing Hr'g Tr., pp.68, 81–82, PageID 900, 913–14. While the court emphasized that continued therapy was necessary for Jaques to keep his life on track, this was merely an exhortation. The court then ordered a mental health assessment as a condition of supervised release. So the court's statements about Jaques's mental health needs "address[ed] the overall sentence, and not just incarceration." *Krul*, 774 F.3d at 374.

The court recommended to the BOP that Jaques "be exposed to [therapy] programming" and "receive a mental health assessment and treatment," R.68, Sentencing Hr'g Tr., pp.86–87, PageID 917–18, but this is also entirely and explicitly permissible under *Tapia*. 564 U.S. at 334 ("[A] court may urge the BOP to place an offender in a prison treatment program."); *see also United States v. Yarbrough*, 774 F. App'x 293, 295 (6th Cir. 2019) (upholding sentence where district judge encouraged defendant to participate in rehabilitative programs while in prison). And these statements do not come close to suggesting rehabilitation was "the reason" for the sentence imposed. *See Deen*, 706 F.3d at 768.

The court also made clear that, while Jaques would benefit from mental health services, the term of incarceration imposed was based on his dangerousness and the dangerousness of his crime. The court emphasized Jaques's violent commentary both prior to arrest and in prison. Jaques made repeated violent statements wishing death upon children, reporters, and animals in a "callous nature," showing his potential for dangerousness. R.68, Sentencing Hr'g Tr., p.70, PageID 902. Jaques's statements even suggested he was hiding the full extent of his "lethality" from the court. R.54, Sentencing Hr'g Tr., p.32, PageID 420. The court heard from mental health

professionals who outlined Jaques's risk of future violent recidivism and suggested he had violent intentions. The court explained that its view of Jaques's dangerousness was based on these evaluations.

In addition to his potential dangerousness, the court also looked to the impact of Jaques's crime on both society and his victims. On one hand, the court was concerned his actions would embolden copycat criminals so a sentence that would deter this activity was necessary. On the other, Washington Middle School had to spend considerable resources to protect itself from Jaques's threat. So the court concluded the fair punishment prong of § 3553(a) required an above-Guidelines sentence. All of this demonstrates that "the reason" for Jaques's sentence was the court's public-safety concerns, not the need for rehabilitation. *See Deen*, 706 F.3d at 768.

Because the court didn't rely on rehabilitation in deciding Jaques's term of imprisonment, it didn't violate *Tapia*. Many of the court's comments about Jaques's need for rehabilitation and treatment either related to the conditions of supervised release or the overall sentence (which included supervised release). And the court was well within its authority to recommend to the BOP that Jaques have access to therapy, mental health assessments, and treatment. But these statements do not show that the court improperly based his term of incarceration on the need for rehabilitation. So no *Tapia* violation occurred.

## III.

Jaques argues next that his sentence was substantively unreasonable because it is too long. Specifically, he points out that the sentence was "double the high end of the Guidelines range" and creates an "unwarranted sentencing disparity under national standards." Appellant Br. at 14–15.

As noted, we review a substantive challenge to the sentence under the abuse-of-discretion standard. *Gall*, 552 U.S. at 51. This review considers "the totality of the circumstances" to ensure

the sentence is "proportionate to the seriousness of the circumstances of the offense and offender, and sufficient but not greater than necessary to comply with the purposes of § 3553(a)." *United States v. Gates*, 48 F.4th 463, 476–77 (6th Cir. 2022) (internal quotation marks omitted). Among those purposes are the need for the sentence "to reflect the seriousness of the offense," "to provide just punishment for the offense," "to afford adequate deterrence to criminal conduct," and "to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2). And since the decision to break with the Guidelines is "a matter of reasoned discretion, not math," we employ a "highly deferential review of a district court's sentencing decisions." *Rayyan*, 885 F.3d at 442.

Despite the upward variance, the district court did not abuse its discretion by sentencing Jaques to 72 months' imprisonment. The sentencing record shows the court considered this issue carefully. It held four sentencing hearings, requested two psychological evaluations, and heard from two former Bureau of Prisons officials before making its decision. The court then provided notice to the parties that it intended to vary upward and offered them the opportunity to give written argument on that decision, despite not being required to provide such notice by law. And when Jaques's counsel expressed concern that Jaques could face violence in a high-security prison, the court made changes and recommendations to avoid that placement, noting that such a facility "would be more punishment than was needed to carry out the purposes of sentencing." R.68, Sentencing Hr'g Tr., p.60, PageID 892.

But the court could not avoid the seriousness of the offense and Jaques's callous attitude toward it. Jaques's threats forced Washington Middle School to spend thousands on enhanced security measures. And the court was concerned his actions might embolden other violent actors in this "era of copycat crimes." *Id*. at p.94, PageID 896. Despite this, Jaques showed little remorse and continued his violent commentary well past his arrest, further showing his dangerous potential.

18

The court echoed the language of § 3553(a)(2) directly in concluding Jaques "[wa]s a danger to the safety of the community, that fair punishment [wa]s not satisfied by a guideline sentence, [and] that deterrence in Mr. Jaques's case deserve[d] a harsher sanction than the guidelines provide." *Id.* at p.81, PageID 913. We cannot say that this conclusion was an abuse of discretion.

Jaques points to the fact that his sentence was double the high end of the Guidelines range. But the key issue is not how much the court varies, but rather, how well the court explains the variance. Under that rule, we have found no abuse of discretion when a district court imposed a sentence nearly triple the high end of the Guidelines range because the court "devoted three days of hearings, considerable briefing, and a 33-page opinion to the issue." *Rayyan*, 885 F.3d at 442. We upheld that sentence upon finding the "district court properly considered all of the factors, balanced them, and imposed a reasonable sentence." *Id.* at 443.

This case is similar. As explained, the court carefully considered the totality of the circumstances affecting Jaques, his crime, and its impact through multiple hearings with multiple witnesses. From there, it found that the Guidelines range "catastrophically underestimate[d] the seriousness of [Jaques's] conduct and the likelihood of recidivism." R.66, Sentencing Hr'g Tr., pp.32–33, PageID 779–80. And only after a thorough review and balancing of the § 3553(a) factors and providing Jaques an opportunity to argue against the variance did the court impose its sentence. So while this variance was significant, we cannot say it was unreasonable.

Jaques's final argument is that his sentence is out of step with national standards, creating "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Appellant Br. at 14 (quoting *United States v. Esteras*, 88 F.4th 1163, 1166 (6th Cir. 2023)). He points to evidence that other firearms defendants in his criminal history category received below-Guidelines sentences. But this ignores the court's key finding that

19

Jaques's crime was "a different type of illegal possession-of-a-machine-gun case." R.68, Sentencing Hr'g Tr., p.81, PageID 913. For one, his offense included a four-point enhancement for using the firearm in connection with another felony—making interstate threats to commit a school shooting. For another, he kept a "small arsenal" of weapons in his home and had a history of violent statements, actions, and online activity. *Id*. at pp.57–64, 77, PageID 889–96, 909.

The court repeatedly emphasized the uniquely dangerous nature of Jaques's conduct, his disregard for that danger, and the court's concern that he posed a continued threat to public safety. *See id*. at p.70, PageID 902. Based on this assessment of Jaques, the court delivered a sentence "proportionate to the seriousness of the circumstances of the offense and offender." *Gates*, 48 F.4th at 476 (internal quotation marks omitted). That sentence may have been out of step with other firearms offenders, but that is only because the court reasonably concluded that Jaques's crime was not like other firearms offenses. For this reason, the court did not abuse its discretion and the sentence was substantively reasonable.

**IV.**

Because the district court's sentence was reasonable, we affirm.