RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0041p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

────────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

ANITA GREEN (24-3887/25-3017); AMANDA HOVANEC (24-3899),

*Defendants-Appellants*.

Nos. 24-3887/3899/25-3017

────────────────

Appeal from the United States District Court for the Northern District of Ohio at Toledo.
No. 3:22-cr-00274—James R. Knepp II, District Judge.

Argued: December 9, 2025

Decided and Filed: February 13, 2026

Before: MOORE, CLAY, and WHITE, Circuit Judges.

────────────────

## COUNSEL

**ARGUED:** Amy Lee Copeland, ROUSE + COPELAND LLC, Savannah, Georgia, for Appellant Anita Green. Benjamin S. Morrell, TAFT STETTINIUS & HOLLISTER LLP, Chicago, Illinois, for Appellant Amanda Hovanec. Laura McMullen Ford, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee. **ON BRIEF:** Amy Lee Copeland, ROUSE + COPELAND LLC, Savannah, Georgia, for Appellant Anita Green. Benjamin S. Morrell, TAFT STETTINIUS & HOLLISTER LLP, Chicago, Illinois, Emily A. England, TAFT STETTINIUS & HOLLISTER LLP, Denver, Colorado, for Appellant Amanda Hovanec. Laura McMullen Ford, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.

---

**OPINION**

---

KAREN NELSON MOORE, Circuit Judge.  Amid their divorce proceedings, Amanda Hovanec killed her husband, T.H., by injecting him with etorphine, a large-animal tranquilizer. Anthony Theodorou, a man with whom Hovanec was romantically involved, shipped the etorphine to Hovanec from South Africa at her request.  Hovanec and Theodorou disposed of the evidence after the murder, and Hovanec's mother, Anita Green, drove them to bury T.H.'s body in the woods.  When the hotel at which T.H. was staying informed the police that he had not checked out as expected, authorities began investigating and arrested Hovanec, Theodorou, and Green.

Theodorou and Hovanec were indicted for conspiracy to import a controlled substance, importation of a controlled substance, conspiracy to possess a controlled substance with intent to distribute, and distribution of a controlled substance with enhancements for causing death. Green was indicted for being an accessory after the fact.  Hovanec, Theodorou, and Green all pleaded guilty.  Hovanec appeals her 480-month sentence; Green appeals her 121-month sentence and the district court's restitution order requiring her to pay for her grandchildren's psychological care.

For the reasons that follow, we **AFFIRM** Green's and Hovanec's sentences and **REVERSE** and **REMAND** Green's restitution order for further proceedings consistent with this opinion**.**

## I. BACKGROUND

**A. Facts**

Hovanec became romantically involved with Anthony Theodorou in South Africa in 2019.  R. 160 (Green Sent'g Tr. at 31:3–7) (Page ID #3288).  Hovanec lived in South Africa with her husband, T.H., who worked for the State Department, and their children.  *See* Hovanec Presentence Report ("PSR") ¶ 6; Hovanec Br. at 3; Appellee Br. at 4.  Hovanec and their children

moved back to the United States in 2020.  R. 160 (Green Sent'g Tr. at 32:10–33:5) (Page ID #3289–90).  Despite this, Hovanec and Theodorou continued their romantic relationship.  *Id.*  Hovanec subsequently filed for divorce from T.H.  *Id.* at 34:7–11 (Page ID #3291).  While the divorce proceedings and related custody disputes were ongoing, Hovanec and her children lived in Ohio with her mother, Anita Green.  *See* Hovanec PSR ¶ 6; Hovanec Br. at 3.

Hovanec claimed that T.H. abused their children, and on November 7, 2021, during their divorce proceedings and custody dispute, she noticed bruising on their oldest daughter and filed a police report.  R. 163 (Hovanec Sent'g Tr. at 69:25–70:18) (Page ID #3565–66); R. 128-2 (Dr. Brams Report at 12–14) (Page ID #2564–66).  Law enforcement determined that the bruise was from T.H. picking the child up by the torso when she was jumping on the bed.  Child Services decided to take no further action on the report because "it didn't appear to be abuse."  R. 163 (Hovanec Sent'g Tr. at 70:15–73:20) (Page ID #3566–69).

After she filed for divorce, Hovanec asked Theodorou if he knew someone who could kill T.H.  R. 160 (Green Sent'g Tr. at 35:4–25) (Page ID #3292).  At Hovanec's direction, Theodorou contacted potential hitmen in South Africa to see if they would be willing to kill T.H.  *Id.* at 36:2–19 (Page ID #3293).  The first potential hitman ultimately backed out, and the second disappeared after Theodorou paid him 50,000 rand.  R. 163 (Hovanec Sent'g Tr. at 54:12–55:1) (Page ID #3550–51).  Theodorou contacted a third potential hitman, at the direction of Hovanec, who ultimately sold him etorphine, a large-animal tranquilizer.  *Id.* at 55:2–57:1 (Page ID #3551–53).  Hovanec traveled to South Africa to meet with the third hitman.  *Id.* at 105:25–106:9 (Page ID #3601–02).  Theodorou, again at the direction of Hovanec, shipped the etorphine from South Africa to Hovanec in the United States via DHL.  *Id.* at 55:22–57:6 (Page ID #3551–53).  Initially, DHL informed Theodorou they would not ship liquids internationally, so Hovanec told Theodorou to conceal the liquid inside another item and not list it on the manifest.  *Id.*

After shipping the etorphine to the United States, Theodorou traveled to Ohio in April 2022 and stayed at Green's home with Hovanec.  R. 160 (Green Sent'g Tr. at 49:12–52:18) (Page ID #3306–09).  On April 22, 2022, a court granted T.H. visitation with their children from April 22 to April 24.  R. 163 (Hovanec Sent'g Tr. at 57:7–16) (Page ID #3553); Hovanec PSR ¶ 8.  The same day, Hovanec told Green, Theodorou, and one of her sisters, Samantha, that she was going

to kill T.H.  R. 163 (Hovanec Sent'g Tr. at 57:12–58:3) (Page ID #3553–54).  The next day, Green showed Hovanec a pond that Green "knew was going to be filled in with soil."  *Id.* at 58:10–14 (Page ID #3554).  At dinner that night, Theodorou, Green, and Hovanec discussed where they should bury T.H.  *Id.* at 58:15–24 (Page ID #3554).  Theodorou stated that it "wasn't a good idea to put him in the pond," so they decided to bury T.H. in the woods.  *Id.*  After dinner, Green gave Hovanec and Theodorou shovels and drove them to dig the grave.  *Id.* at 59:5–21 (Page ID #3555).  On April 24, T.H. arrived to drop the children off at Green's home following his visitation.  *Id.* at 33:10–14 (Page ID #3529).  T.H. had a dash camera ("dashcam") in his car, which captured the following events.  After T.H. pulled into the driveway, the children got out of the car and Green "scurr[ied] the kids into the house," followed the last child in, and closed the door.  *Id.* at 33:17–34:5 (Page ID #3529–30).  Out of view of the camera, a scuffle broke out between Hovanec and T.H., and he can be heard asking "[d]id you just assault me?"  *Id.* at 34:5–8 (Page ID #3530).  Hovanec chased T.H. around his car and tried to knock his phone out of his hand.  *Id.* at 34:9–14 (Page ID #3530).  Hovanec then wrestled T.H. to the ground.  *Id.*  Once T.H. stopped moving, she removed his watch and turned the car off.  *Id.* at 34:19–23 (Page ID #3530).  Hovanec had killed T.H. by injecting him with a syringe filled with etorphine.  *Id.* at 69:4–21 (Page ID #3565).

Hovanec then drove T.H.'s car to Dayton, Ohio, where she had planned to leave his car and to dump his belongings near where he went skydiving, and Theodorou followed Hovanec in her car.  *Id.* at 45:14–46:25 (Page ID #3541–42); 4/24/2022 Dashcam Footage 20:13:18–51.  The dashcam in T.H.'s car captured Hovanec and Theodorou discussing "wiping" T.H.'s car down and Hovanec stopping and attempting to throw T.H.'s belongings in trash cans.  R. 163 (Hovanec Sent'g Tr. at 48:21–49:9) (Page ID #3544–45); 4/24/2022 Dashcam Footage 20:13:18–30.  Hovanec disposed of T.H.'s phone and personal belongings and left his car in a "rough area" in Dayton, which she described as the "ghetto."  R. 163 (Hovanec Sent'g Tr. at 31:1–22, 69:16–25) (Page ID #3527, 3565); 4/24/2022 Dashcam Footage 20:13:40–51.  When investigators found the car, there were no license plates on it.  R. 163 (Hovanec Sent'g Tr. at 31:1–22) (Page ID #3527).  Theodorou and Hovanec returned from Dayton, and Green drove them to bury T.H.'s body.  They had "prearranged a plan where they weren't going to use cell phones," so Green dropped Hovanec and Theodorou at the location where they planned to bury T.H. and then drove

back to the area periodically to see if Hovanec and Theodorou were finished. *Id.* at 46:2–25 (Page ID #3542).

On April 27, the police informed the FBI that T.H. had not checked out of his hotel as expected. *Id.* at 25:21–25 (Page ID #3521). The same day, investigators went to Green's home and spoke with Hovanec about T.H.'s whereabouts. *Id.* at 29:3–7 (Page ID #3525). Investigators received location data for T.H.'s cellphone, which showed the last ping was in Dayton. *Id.* at 29:19–30:25 (Page ID #3525–26). They then located T.H.'s car in Dayton and found the car's dashcam. *Id.*; *id.* at 31:1–17 (Page ID #3527). After Hovanec initially spoke with investigators, Hovanec sent T.H. a message on Family Wizard, "an app that they were using for custody issues," saying "that he had left all his personal belongings at the hotel, the hotel had turned those belongings over to the police and that people were concerned about his whereabouts and he needed to call as soon as possible." *Id.* at 119:21–120:7 (Page ID #3615–16). When investigators asked Hovanec at her second interview if she had tried to contact T.H., she said she had and told them about the message. *Id.* Hovanec also told investigators that T.H. had friends in Dayton and that he might be there skydiving with them. *Id.* at 120:22–121:10 (Page ID #3616–17).

In the middle of Hovanec's second interview, the investigator interviewing her was informed that the dashcam footage had been discovered and that it showed Hovanec murdered T.H. *Id.* at 122:1–4 (Page ID #3618). When confronted with that information, Hovanec admitted to killing T.H. *Id.* at 122:8–19 (Page ID #3618). She admitted that she had "wiped down the steering wheel" of T.H.'s car and took "his phone, the license plate from the car and the other personal belongings of [T.H.'s] and . . . threw those away in dumpsters." *Id.* at 124:4–14 (Page ID #3620). Hovanec confessed that she had taken T.H.'s body to the woods to bury him and said that Theodorou dug the grave because "she made him" even though "he didn't want to." *Id.* at 125:4–23 (Page ID #3621). Hovanec also stated "I made them all do it" during this interview when asked about Green's and Theodorou's involvement in the murder. *Id.* at 146:12–15 (Page ID #3642); Hovanec PSR ¶ 20. Theodorou showed investigators the wooded area where T.H. was buried in a grave. R. 163 (Hovanec Sent'g Tr. at 39:16–43:5) (Page ID #3535–39).

When Green was interviewed by investigators, she told them "she was aware of the poison and that [Hovanec] was going to do something before [T.H.] had arrived."  R. 160 (Green Sent'g Tr. at 137:14–21) (Page ID #3394).  Green initially denied knowing that Hovanec was going to use a syringe to kill T.H., but later Green acknowledged that Hovanec had told her about the syringe.  *Id.* at 137:21–138:9 (Page ID #3394–95).  Green also denied at first that she drove T.H.'s body to be buried, but eventually admitted that she had.  *Id.* at 138:22–139:2 (Page ID #3395–96).

**B.  Procedural History**

Hovanec was indicted for conspiracy to import a controlled substance, in violation of 21 U.S.C. § 963; importation of a controlled substance, in violation of 21 U.S.C. §§ 952(a), 960(a)(1) and (b)(3); conspiracy to possess with intent to distribute and distribution of a controlled substance, in violation of 21 U.S.C. § 846; and distribution of a controlled substance, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C).  R. 11 (Indictment at 1–4) (Page ID #85–88).  Hovanec was also charged with enhancements for death or serious bodily injury resulting from the controlled-substance charges.  *Id.*  Green was indicted as an accessory after the fact in violation of 18 U.S.C. § 3.  *Id.* at 5 (Page ID #89).  Hovanec and Green each pleaded guilty without plea agreements.  *See* R. 66 (Green Change of Plea Tr. at 19:23–25, 44:18–21) (Page ID #604, 629); R. 93 (Hovanec Change of Plea Tr. at 19:9–20, 30:21–31:7) (Page ID #1101, 1112–13).  During Green's change-of-plea hearing, Green took issue with admitting to prior knowledge of the murder.  R. 66 (Green Change of Plea Tr. at 34:5–36:5, 41:1–42:20) (Page ID #619–21, 626–27).

**1.  Green**

Green's PSR recommended that she receive an acceptance-of-responsibility reduction in her offense-level calculation.  *See* Green PSR ¶ 29–30.  The Government did not initially object to the reduction.  After obtaining further information about Green's involvement prior to the murder, however, the Government filed an objection.  Specifically, Theodorou informed the Government that Green was present for conversations about the murder two days beforehand, assisted in selecting the location to bury T.H., drove Hovanec and Theodorou to dig the grave

prior to the murder, and agreed to distract the children while Hovanec murdered T.H., among other facts. *See* R. 125 (Gov't Suppl. Sent'g Mem. at 2) (Page ID #2490). Hovanec also submitted a second acceptance-of-responsibility statement that provided that she and Theodorou had dug the grave in advance, corroborating Theodorou's testimony that they dug the grave in advance. *Id.* at 3 (Page ID #2491). The Government argued that this showed that Green had been dishonest during her change-of-plea hearing, where she denied knowing about the murder plan beforehand. *Id.* at 4 (Page ID #2492).

Theodorou testified to those facts at Green's sentencing. R. 160 (Green Sent'g Tr. at 23:21–127:14) (Page ID #3280–3384). The district court denied Green a reduction for acceptance of responsibility because the new evidence showed that she was dishonest during the change-of-plea hearing. *Id.* at 188:7–190:17 (Page ID #3445–47). Green's guidelines range was 97–121 months, *id.* at 190:18–20 (Page ID #3447), and the court sentenced her to 121 months of imprisonment, *id.* at 218:1–5 (Page ID #3475). Green filed a timely notice of appeal as to her sentence. R. 144 (Green Initial Notice of Appeal) (Page ID #3214).

The Government requested that Green be ordered to pay restitution for the cost of psychological counseling for Hovanec's and T.H.'s children. R. 106 (Gov't Restitution Br. at 17) (Page ID #1521). Green opposed this request, arguing that she did not cause the children "bodily injury," which is a statutory prerequisite to awarding restitution. R. 151 (Green Opp'n to Restitution Request at 2–3) (Page ID #3232–33). The district court held that "bodily injury" encompasses mental harm and ordered Green to pay "$126,000.00 (jointly and severally with co-Defendants Hovanec and Theodorou) in restitution." R. 161 (Restitution Order at 2–6) (Page ID #3486–90). Green timely appealed. R. 164 (Green Second Notice of Appeal) (Page ID #3716).

### 2. Hovanec

In Hovanec's sentencing memorandum, she argued that the sentencing enhancements for her aggravating role in the offense and obstruction of justice should not apply. R. 128 (Hovanec Sent'g Mem. at 6–8) (Page ID #2547–49). The district court ultimately determined that the enhancements applied, but granted Hovanec a two-level reduction for acceptance of responsibility, despite the Government's objection. R. 163 (Hovanec Sent'g Tr. at 157:9–159:6,

165:7–18) (Page ID #3653–55, 3661).  Hovanec's guidelines range was life.  *Id.* at 167:20–22 (Page ID #3663).

Hovanec's sentencing memorandum also included an attached psychological evaluation conducted by Dr. Brams.  Hovanec argued that the evaluation would "help the Court understand [Hovanec's] state of mind at the time of the offense and how she got there" and provide information about her history and characteristics.  R. 128 (Hovanec Sentencing Mem. at 4–5) (Page ID #2545–46).  Dr. Brams's report noted that she evaluated Hovanec at Hovanec's attorney's request so that her report "could be used in his defense of Ms. Hovanec" and that she "was retained for her time and expertise, and not to provide any predetermined opinions regarding this legal matter."  R. 128–2 (Dr. Brams Rep. at 1–2) (Page ID #2553–54).  To conduct her assessment, Dr. Brams interviewed Hovanec twice and interviewed two of Hovanec's five sisters, Jill and Samantha, over the phone.  *Id.* at 2 (Page ID #2554).  The report noted that only two of Hovanec's five sisters were interviewed because "this is a fractured family and some of her sisters refused to participate in th[e] evaluation."  *Id.* at 5 (Page ID #2557).  Dr. Brams also reviewed documents, including the PSR, documents "pertaining to the divorce" and custody dispute between T.H. and Hovanec, interviews of Hovanec's coworkers and information "related to her employment in South Africa," "Children Service records" from after the murder, "law enforcement records including but not limited to interviews with the defendant, information regarding the codefendants (her mother and boyfriend), the coroner's report, and a variety of miscellaneous information."  *Id.* at 2 (Page ID #2554).

The report relayed Hovanec's accounts of "horrific [childhood] abuse" and that Jill and Samantha both reported that they grew up in an abusive family and have suffered from mental-health issues as a result.  *Id.* at 4–8 (Page ID #2556–60).  The report also recounted that Hovanec "describe[d] increasingly degrading, isolating, manipulative, and often angry and abusive scenes in [her] marriage [to T.H.] when the family lived in Germany and later in South Africa."  *Id.* at 12 (Page ID #2564).  Dr. Brams also noted that Hovanec was "convinced that [T.H.] was going to kidnap the children," Hovanec believed that T.H. abused their children and was a "grave danger" to them, and Hovanec saw no alternative to the murder because she "believe[d] that her children's lives were in danger [and] that the court was not responsive."  *Id.* at 13–16 (Page ID

#2565–68).  Dr. Brams concluded that Hovanec "clearly and definitively meets the criteria for posttraumatic stress disorder," "functions on an emotional level far below that of adulthood," "presents as having an eating disorder," "would meet a diagnosis of Substance Disorder," "meets the criteria for Persistent Depressive Disorder," "ha[s] characteristics of many personality disorders," and possibly has "symptoms on the autism spectrum." *Id.* at 17–18 (Page ID #2569–70).

The district court heard arguments from both parties regarding Dr. Brams's report.  R. 163 (Hovanec Sent'g Tr. at 195:21–198:7, 201:25–207:3) (Page ID #3691–94, 3697–3703).  The Government presented various reasons that it did not believe the district court should credit the Brams report, and Hovanec argued that the district court should view the report as important evidence.  The district court ultimately considered Dr. Brams's report, but with skepticism based on the reasons the Government had presented.  *Id.* at 209:23–210:6 (Page ID #3705–06).

In the end, the district court granted Hovanec a downward variance from the guidelines range of life imprisonment, which the Government argued against, and sentenced her to 480 months of imprisonment.  *Id.* at 206:3–9, 212:1–5 (Page ID #3702, 3708).  Hovanec timely appealed.  R. 147 (Hovanec Notice of Appeal) (Page ID #3221).

## II. ANALYSIS

### A. Green's Appeal

#### 1. Acceptance of Responsibility

Green argues that the district court erred at sentencing in denying her a reduction in her offense level for acceptance of responsibility.  Green Br. at 20–37.  A defendant may receive a two-level reduction under the Sentencing Guidelines if they "clearly demonstrate[] acceptance of responsibility for [their] offense."  U.S.S.G. § 3E1.1(a).  "The defendant bears the burden to clearly demonstrate that [t]he[y] ha[ve] accepted responsibility." *United States v. Jett*, 154 F.4th 459, 464 (6th Cir. 2025).  In determining whether the defendant has met that burden, courts consider factors such as whether the defendant "truthfully admit[ed] [to] the conduct comprising the offense(s) of conviction, and truthfully admit[ed] or not falsely den[ied] any additional

relevant conduct for which the defendant is accountable," "voluntar[ily] terminat[ed] or withdr[ew] from criminal conduct or associations," "voluntar[ily] pa[id] . . . restitution prior to adjudication of guilt," and "voluntary[ily] surrender[ed] to authorities promptly after commission of the offense," among other things.  U.S.S.G. § 3E1.1(a) cmt. n.1.  A defendant is not entitled to the reduction "*merely* because [they have] pleaded guilty." *Jett*, 154 F.4th at 466.

We review a district court's factual determinations for clear error.  *United States v. Denson*, 728 F.3d 603, 614 (6th Cir. 2013).  The correct standard for reviewing the district court's application of the guidelines to uncontested facts, however, is unsettled in this circuit. *See United States v. Thomas*, 933 F.3d 605, 611 (6th Cir. 2019) (noting that our cases have "diverged on the standard of review"); *United States v. Prater*, No. 22-5599, 2024 WL 3634526, at *6 (6th Cir. Aug. 2, 2024) (similar).  We need not resolve that dispute now because two of Green's arguments are reviewed for plain error and her third argument fails under any standard.

We review for plain error when the defendant fails to raise their objection in the district court in a manner that would inform that court of the basis of the objection and allow the court to correct the error.  *Jett*, 154 F.4th at 469.  Here, Green objected only generally to the district court's refusal to grant the reduction but did not argue that the court erroneously interpreted her statements at the plea hearing or that the district court should not have relied on Green's statements before her guilty plea was entered.  *See* R. 160 (Green Sent'g Tr. at 173:2–174:11, 177:7–185:21, 225:14–226:15) (Page ID #3430–31, 3434–42, 3482–83).  Therefore, we review for plain error whether Green's statements at the change-of-plea hearing reflect a refusal to accept responsibility and whether the court should have considered only her statements after her plea was entered.  To succeed under that standard, Green "must 'show (1) error (2) that "was obvious or clear," (3) that "affected defendant's substantial rights" and (4) that "affected the fairness, integrity, or public reputation of the judicial proceedings."'" *United States v. Cabrera*, 811 F.3d 801, 808 (6th Cir. 2016) (quoting *United States v. Vonner,* 516 F.3d 382, 386 (6th Cir. 2008) (en banc)).

### a. Statements During Green's Change-of-Plea Hearing

Green argues that the district court erred for two reasons by considering her statements during the change-of-plea hearing as evidence that she did not accept responsibility. Green Br. at 24–27. First, she asserts that the district court should not have considered her statements prior to the actual entry of her guilty plea, and second, she claims that her statements at the hearing do not in fact show she was falsely denying relevant conduct.

To support her first argument, Green relies on cases in which we have held that a district court may not deny an acceptance-of-responsibility reduction based on a defendant's other criminal conduct that was committed prior to their federal indictment or guilty plea. We did so because "there [must] be some conduct that the court can find is inconsistent with that *specific* acceptance of responsibility referred to in the Commentary, namely the acceptance of the guilty plea," and preindictment criminal conduct is not inconsistent with accepting responsibility for the specific crime to which the defendant is pleading guilty. *United States v. Jeter*, 191 F.3d 637, 641 (6th Cir. 1999) (emphasis added), *abrogated on other grounds by*, *Buford v. United States*, 532 U.S. 59 (2001)). Instead, "the defendant must be on notice that the federal government has an interest in his or her affairs" or the other criminal conduct does not "impeach[] [the] defendant's acceptance of responsibility." *Id.* at 639–41. Otherwise, all prior criminal conduct "would place any defendant who has a prior record of similar crimes at risk of having the district court deny a reduction for acceptance of responsibility" thereby "penaliz[ing] the defendant for a criminal disposition." *Id.* at 640–41.

In *United States v. Tilford* we held that the defendant's criminal activity after the IRS interviewed him, but before he was indicted and pleaded guilty, could not be used to deny the reduction. 224 F.3d 865, 867–68 (6th Cir. 2000), *abrogated on other grounds by*, *Buford v. United States*, 532 U.S. 59 (2001). We noted that "the defendant must be on notice that the federal government has an interest in his or her affairs before the acceptance-of-responsibility guideline comes into play." *Id.* at 868. We thus concluded that the relevant period for evaluating whether Tilford's other criminal conduct showed that he did not accept responsibility was "the period following the entry of Tilford's guilty pleas," and therefore his prior criminal conduct could not be used to deny him a reduction. *Id.* Importantly, because the other crimes Tilford

committed occurred before *both* his indictments and guilty pleas, our holding would have been identical for functional purposes if we had substituted "indictments" for "guilty pleas." *Id.* at 866, 868.

To be sure, some of our cases broadly state that courts may consider only a defendant's other criminal activity after entry of a guilty plea. *See, e.g.*, *Tilford*, 224 F.3d at 868; *United States v. Hakley*, 101 F. App'x 122, 127–33 (6th Cir. 2004) (holding the district court could not consider the defendant's conduct prior to the entry of his guilty plea, including violating the terms of supervised release and stealing checks, as "conduct of the defendant that is inconsistent with such acceptance of responsibility" because "*Jeter* and its progeny indicate that acceptance of responsibility generally does not occur until entry of a plea"). Nevertheless, we have never held that a defendant's statements in the process of entering a plea could not be considered by the district court. Importantly, considering a defendant's statements during the change-of-plea hearing that show the defendant did not accept responsibility is different in kind from considering prior criminal conduct. Such denials are clearly "inconsistent with that *specific* acceptance of responsibility" at issue. *Jeter*, 191 F.3d at 641 (emphasis added). It would make little sense to say that entering a guilty plea is "significant evidence" of acceptance of responsibility but at the same time to hold that courts may not consider the defendant's dishonesty in the very process of entering that plea. U.S.S.G. § 3E1.1 cmt. n.3.

Green next argues that even if the district court could consider her statements at her change-of-plea hearing, the court misinterpreted her statements about her prior knowledge of the plan to murder T.H. Green Br. at 28–32. Green claims that she denied only knowing that a controlled substance was used to kill T.H. and that she did not more broadly deny knowledge of the plan to murder him. A full review of Green's statements at the change-of-plea hearing, however, shows that the district court did not plainly err in determining that Green was dishonest as to her prior knowledge of the plan to kill T.H.

During the change-of-plea hearing, the Government recited the following as the factual basis for the plea: Hovanec and Theodorou "did knowingly and intentionally distribute a controlled substance to T.H. that resulted in T.H.'s death. The defendant, Anita Green, knew that Amanda Hovanec and Anthony Theodorou had committed this crime and thereafter took steps to

help them avoid being arrested, prosecuted or punished. Specifically, after this crime had been committed, [Green] drove Amanda Hovanec, Anthony Theodorou and T.H.'s dead body to a location where Amanda and Anthony buried T.H.'s body." R. 66 (Green Change of Plea Tr. at 34:5–15) (Page ID #619). The court then inquired whether Green "did . . . what [the Government] says [she] did," and Green responded, "I'm questioning the 'knowingly'" and "I forget how you started." *Id.* at 35:10–16 (Page ID #620). The court asked, "[w]hat are you saying you didn't know" and Green responded, "I don't know what they did." *Id.* at 35:17–20 (Page ID #620). The court then followed up by asking, "[w]ell, did you know that they --- did you know that they killed T.H.?" to which Green answered, "I did, after the fact, yes. . . I just don't know how." *Id.* at 35:21–25 (Page ID #620). The court again attempted to clarify, and asked "you knew that they had killed T.H.; correct?" and Green replied "[y]es, after the fact, I knew that." *Id.* at 36:1–5 (Page ID #621).

Shortly thereafter, defense counsel and Green conferred off the record. Upon returning to the courtroom, defense counsel explained that Green was confused by the way "knowingly" was described in court, but that she was prepared to plead guilty. *Id.* at 41:1–23 (Page ID #626). The court then again asked Green "you knew that they killed T.H., I'm thinking, in the driveway there; right? I mean, you knew that it had happened; correct?" *Id.* at 42:10–15 (Page ID #627). Green answered "I know. Yes, I do." *Id.* at 42:16 (Page ID #627). The court then stated, "[a]ll right. And they did it with some kind of drug that they imported. You knew that also, correct?" *Id.* at 42:17–19 (Page ID #627). Green answered "[a]fter the fact, yes." *Id.* at 42:20 (Page ID #627).

Green argues that the exchange after she conferred with counsel demonstrates that she denied only knowing that Hovanec used a controlled substance until "after the fact," and that she did not otherwise deny her prior knowledge. Green Br. at 30. Perhaps one could interpret Green's statements that way. But one could readily interpret Green's statements as denying prior knowledge of the murder plan more broadly. When clearly asked by the district court whether Green knew that Hovanec and Theodorou killed T.H., Green said "[y]es, after the fact, I knew that." R. 66 (Green Change of Plea Tr. at 36:1–5) (Page ID #621). And even after Green conferred with her counsel, Green answered the court's question "you knew that they killed T.H.,

I'm thinking, in the driveway there; right?  I mean, you knew that it had happened; correct?" in the *present* tense saying, "I know.  Yes, I do."  *Id.* at 42:10–16 (Page ID #627).  It was not plain error for the district court to reject the most "sympathetic reading" of the testimony that Green presses here.  *United States v. Lay*, 583 F.3d 436, 449 (6th Cir. 2009).

Such a denial constituted falsely denying relevant conduct.  The guidelines provide that entry of a guilty plea, truthfully admitting to the offense, and "truthfully admitting or not falsely denying any additional relevant conduct for which the defendan is accountable under § 1B1.3" is an appropriate consideration in determining whether the defendant has accepted responsibility.  U.S.S.G. § 3E1.1 cmt. n.1(A).  Even though "a defendant is not required to volunteer, or affirmatively admit, relevant conduct beyond the offense of conviction in order to obtain a reduction," they may not falsely deny "relevant conduct."  *Id.*  Relevant conduct for accessory after the fact, the crime to which Green pleaded guilty, "includes all conduct relevant to determining the offense level for the underlying offense that was known, or reasonably should have been known, by the defendant."  U.S.S.G. § 1B1.3 cmt. n.9.  The "underlying offense[s]" are the offenses to which Hovanec and Theodorou pleaded guilty:  importation, possession, and distribution of a controlled substance with enhancements for causing death.  U.S.S.G. § 2X3.1 cmt. n.1; R. 11 (Indictment at 1–4) (Page ID #85–88); R. 93 (Hovanec Plea Tr. at 30:21–31:7) (Page ID #1112–13).  Therefore, it was proper for the district court to consider whether Green falsely denied her prior knowledge of the plan to murder T.H. using a controlled substance in determining whether Green accepted responsibility for her offense, and Green does not argue otherwise.  *See United States v. Jones*, 145 F.3d 1334, 1998 WL 152750, at *2 (6th Cir. 1998) (per curiam) (table) ("Because Jones was sentenced as an accessory *after* the fact, the pertinent inquiry related to her cognizance of the special characteristics of Baugh's offense *at or prior to the time that she became Baugh's accessory after the fact*."); *United States v. Mojica-Baez*, 229 F.3d 292, 312 (1st Cir. 2000).

Against this conclusion, Green presents several arguments.  First, Green argues that she was not required to "volunteer or affirmatively admit" all details of relevant conduct.  Green Br. at 36–37.  True, a defendant is not required to do so, and may simply remain silent as to their other relevant conduct.  *United States v. Cook*, 607 F. App'x 497, 501 (6th Cir. 2015); U.S.S.G.

§ 3E1.1 cmt. n.1.  But a defendant cannot falsely deny relevant conduct if they choose to speak on it.  *Thomas*, 933 F.3d at 612.  Green did so here by denying prior knowledge of the plan to murder T.H.  The district court did not place Green in a catch-22 of either having to incriminate herself or to falsely deny relevant conduct.  The district court did not ask Green whether she knew about the plan before the murder—she made the statements of her own accord when asked if she had committed the offense to which she was pleading guilty, accessory after the fact.

Next, Green argues that her post-indictment and post-plea conduct shows that the district court misinterpreted her statements during the change-of-plea hearing.  *See* Green Br. at 33–36.  Specifically, Green points out that during her proffer she admitted that she lied to investigators in her preindictment interviews and said Hovanec had told her that she "had to do something" about T.H.  *Id.* at 33.  Even though Green's statements during her proffer may lend some support to her reading of her statements at the change-of-plea hearing, that is not enough to show that the district court clearly erred because "'[w]here there are two permissible views of the evidence,' the district court does not clearly err in accepting one interpretation over the other."  *United States v. Hinojosa*, 606 F.3d 875, 882 (6th Cir. 2010) (quoting *United States v. Navarro-Camacho*, 186 F.3d 701, 708 (6th Cir. 1999)).

### b.  Preindictment Interview Statements

Green argues that the district court should not have considered her statements about whether she knew that Hovanec had a syringe before Hovanec murdered T.H. because Green made them in preindictment interviews.  Green Br. at 24–27.  Green did not raise this objection before the district court, as discussed above, so we review for plain error.  *See* R. 160 (Green Sent'g Tr. at 173:2–174:11, 177:7–185:21, 225:14–226:15) (Page ID #3430–31, 3434–42, 3482–83); *Jett*, 154 F.4th at 469.  The record does not reflect that the district court denied Green the acceptance-of-responsibility reduction because these statements to investigators falsely denied relevant conduct.  Instead, the district court relied on these statements as evidence that Green knew of the plan to murder T.H. beforehand in reaching its conclusion that Green was dishonest during the change-of-plea hearing.

The district court repeatedly emphasized that it was very troubled with Green's statements about her knowledge at her change-of-plea hearing.  The district court opined, "[a]s it comes to Ms. Green's acceptance at the time of her plea, she was very particular about she only knew about anything after the fact."  R. 160 (Green Sent'g Tr. at 188:8–10) (Page ID #3445).  The court mentioned Green's syringes comment only once immediately after discussing Theodorou's testimony that Green drove him and Hovanec to dig the grave the day before the murder.  *Id.* at 188:7–20 (Page ID #3445).  Specifically, the court stated that given the evidence from Theodorou and Green's statements "about knowing about poison and not syringes and then syringes . . . it's inescapable for [the court] to conclude . . . judging on what [the court] ha[s] seen and heard, that [Green] did, in fact, know that this plan was afoot, and . . . [the court is] very troubled by her parsing the word 'knowingly' and making a big deal about [knowing only] after the fact at the time of her change of plea."  *Id.* at 188:11–189:2 (Page ID #3445–46).  The court then discussed additional reasons it believed Theodorou's testimony and concluded by stating "[s]o I find that [Green] did mislead, or let's say lie or not be candid at the time of her acceptance of the factual basis for the plea."  *Id.* at 189:10–190:17 (Page ID #3446–47).

This clearly demonstrates that the district court denied Green an acceptance reduction based on its belief that Green was dishonest during her change-of-plea hearing and used Green's statements about the syringes only to support that conclusion.  And it makes good sense that the court corroborated Green's prior knowledge of the plan to murder T.H. with her own statements because Green's attorney argued that Theodorou's testimony, the other key evidence on Green's knowledge prior to the murder, should be disregarded because Theodorou was not credible.  *See id.* at 177:14–181:3 (Page ID #3434–38).

Green points to no caselaw holding that courts cannot consider a defendant's prior statements for the limited purpose of supporting the court's conclusion that the defendant's later statements were false.  Relying on statements for such a limited purpose is different in kind from using the preindictment statements themselves as the basis for denying the acceptance reduction, which may present a closer question.  It would not be a sound approach to hold that, in determining whether the defendant was honest about their knowledge, district courts cannot consider the defendant's prior statements when other evidence also indicates that the later

statements were false.    Therefore, the district court's use of Green's statements about her knowledge of Hovanec's possession of a syringe for the limited purpose of supporting the court's conclusion that her later statements at the change-of-plea hearing were false was not plainly erroneous.

### c. Entitlement to Reduction

Green's final argument is that she was entitled more broadly to a reduction for acceptance of responsibility.  Green Br. at 33, 37.  In support, Green points only to her proffer, guilty plea, and that she settled a civil suit with T.H.'s estate.  *Id.*  Green's settlement with the estate occurred after Green pleaded guilty, *id.*, which undermines the weight of that evidence, *cf.* U.S.S.G. § 3E1.1 cmt. n.1(C) (stating that "voluntary payment of restitution *prior to* adjudication of guilt" is evidence that the defendant accepted responsibility (emphasis added)).  And Green's proffer and guilty plea do not entitle her to a reduction for acceptance of responsibility given that she falsely denied relevant conduct.  *See United States v. Conner*, 531 F. App'x 633, 635 (6th Cir. 2013) (per curiam); *Lay*, 583 F.3d at 448–49; *United States v. Bonds*, 48 F.3d 184, 189 (6th Cir. 1995) ("Denial of the reduction for acceptance of responsibility is proper if the court believes the defendant testified untruthfully.").  Therefore, the district court did not err in denying Green a reduction for acceptance of responsibility.

### 2. Restitution

The district court ordered Green to pay $126,000 in restitution, jointly and severally with Hovanec and Theodorou, for the "minor child victims . . . for past and future mental health treatment" under 18 U.S.C. § 3663.  R. 161 (Restitution Order at 1–2) (Page ID #3485–86).[1] Section 3663(b)(2)(A) provides that "in the case of an offense resulting in bodily injury to a victim" a victim may receive restitution for the cost of their "psychological care."  The district court held that psychological harm is itself sufficient to qualify as "bodily injury" under the

---

[1]The district court stated that it was awarding restitution under 18 U.S.C. § 3663A, the Mandatory Victims Restitution Act of 1996. *Id.*  Restitution under that statute, however, is available only if the defendant was convicted of certain enumerated offenses.  18 U.S.C. § 3663A(a)(1).  The parties agree that the proper basis for restitution in this case is the Victim and Witness Protection Act, 18 U.S.C. § 3663, because Green was not convicted of an offense enumerated in § 3663A(c). *See* Green Br. at 40; Appellee Br. at 49.  The language at issue in this case is identical in § 3663 and § 3663A for present purposes, so, as Green puts it, it is "a distinction without difference" here.  Green Br. at 40 n.10.

statute.  Green argues, however, that was erroneous because psychological harm is not "bodily injury."  Green Br. at 38.**[2]**

We review questions of statutory interpretation de novo.  *United States v. Church*, 731 F.3d 530, 535 (6th Cir. 2013).  "'Because federal courts have no inherent power to award restitution,' restitution orders are proper 'only when and to the extent authorized by statute.'"  *Id.* (quoting *United States v. Evers*, 669 F.3d 645, 655–56 (6th Cir. 2012)).  Section 3663 allows courts in certain cases to "order that a defendant provide restitution to a victim in compensation for the victim's loss."  *United States v. Scott*, 74 F.3d 107, 110 (6th Cir. 1996).  The Government bears the burden of establishing restitution by a preponderance of the evidence.  *United States v. Fike*, 140 F.4th 351, 357 (6th Cir. 2025).

When interpreting a statute, we start with the text, which must be read "in context."  *In re MCP No. 185*, 124 F.4th 993, 1001 (6th Cir. 2025).  When Congress does not define a term, courts "must give the words 'their ordinary, contemporary, common meaning, absent an indication Congress intended them to bear some different import.'"  *Grand Traverse Band of Ottawa & Chippewa Indians v. U.S. Att'y W. Dist. of Mich.*, 369 F.3d 960, 967 (6th Cir. 2004) (quoting *Williams v. Taylor*, 529 U.S. 420, 431–32 (2000)).  Contemporary dictionary definitions often shed light on the ordinary meaning of the term.  *Id*.

The Victim and Witness Protection Act was passed in 1982 and contained the relevant statutory language.  *See* Victim and Witness Protection Act of 1982, Pub. L. No. 97–291, 96 Stat. 1248, 1253–54.  Congress did not define "bodily injury" in § 3663, so we begin by looking to contemporary dictionary definitions.  Contemporary dictionaries define "bodily" as "of or pertaining to the body," and "corporeal or material, as contrasted with spiritual or mental."  Random House Unabridged Dictionary (2d ed. 1993); *see also Bodily*, Merriam-Webster Dictionary (10th ed. 1995) ("adj[.] 1: having a body: Physical 2: of or relating to the body[.] adv[.] 1: in the flesh: Physically"); *Bodily*, Black's Law Dictionary (5th ed. 1979) ("Pertaining to or concerning the body; of or belonging to the body or the physical constitution; not mental but corporeal. . . .  Bodily injury [g]enerally refers only to injury to the body, or to sickness or

---

**[2]**Green does not dispute that her grandchildren qualify as "victims" of her crime.

disease contracted by the injured as a result of injury."); *Bodily*, Ballentine's Law Dictionary (3d ed. 1969) ("Pertaining to or concerning the body; . . . not mental, but corporeal").  These definitions demonstrate that "bodily injury" is defined as a physical or corporeal injury and contrasted with mental or spiritual injuries.

The Government argues that we should not consider dictionary definitions because the subsection at issue here allows for "necessary medical and related professional services and devices relating to physical, psychiatric, and psychological care."  Appellee Br. at 51; 18 U.S.C. § 3663(b)(2)(A).  This provision for the cost of psychological care, the argument goes, demonstrates that "bodily injury" includes mental harms.  This provision, however, sheds little light on the meaning of "bodily injury" because it is entirely plausible that Congress may have intended to compensate only the victims of physical harm for their psychological care.  And, if anything, this language cuts against the Government, because had Congress intended "bodily injury" to include "physical, psychiatric, and psychological" injury it would render the term "bodily injury" superfluous.  We generally avoid interpreting statutes in a manner that would render language superfluous. *In re Vill. Apothecary, Inc.*, 45 F.4th 940, 948 (6th Cir. 2022).

The dictionary definitions of "bodily" are in accord with the conclusions of all of our sibling circuits that have addressed the question de novo. *See United States v. Reichow*, 416 F.3d 802, 806 (8th Cir. 2005); *United States v. Hicks*, 997 F.2d 594, 601 (9th Cir. 1993); *United States v. Powell*, 42 F. App'x 565, 573 (4th Cir. 2002) (per curiam).  For example, in *Hicks*, the Ninth Circuit held that "[t]he cost of psychological counseling can be included in a restitution order only when the victim has suffered physical injury."  997 F.2d at 601.  The Seventh and Tenth Circuits, however, held it was not plain error to interpret "bodily injury" in § 3663 to cover a victim's mental injuries without any clear evidence that the victim also suffered a physical injury. *See United States v. Breshers*, 684 F.3d 699, 702–03 (7th Cir. 2012); *United States v. Dotson*, 242 F.3d 391, 2000 WL 1820375, at *5 (10th Cir. 2000) (table) (order).  The analysis in both of those cases was heavily contingent on the plain-error standard of review, and the courts went no further than explaining how the interpretation was not plainly erroneous. *See, e.g.*, *Dotson*, 2000 WL 1820375, at *5 ("We decline to reach the issue of whether an award of restitution . . . can be predicated on a victim's mental injuries alone.").  Cases from other contexts also support the

conclusion that "bodily" excludes purely mental harms.  For example, in *Berg v. E.I. Dupont De Nemours & Co.* (*In re Berg Litig.*), the Ninth Circuit held that "bodily injury" in the Price-Anderson Act did not "reach purely emotional injuries."  293 F.3d 1127, 1132 (9th Cir. 2002).  In light of the dictionary definitions and the weight of authority, we hold that "bodily injury" in 18 U.S.C. § 3663 does not encompass purely mental or psychological harms.

Resisting this conclusion, the Government cites other sections in Title 18 in which Congress defined "bodily injury" or "serious bodily injury" to include "impairment of the function of a . . . mental faculty."  Appellee Br. at 52.  True, Congress has done so.  *See* 18 U.S.C.  §§ 43(d)(4)–(5),  831(g)(5),  113(b)(1),  1515(a)(5),  1365(h)(4),  1864(d)(2)(D), 2118(e)(3), 2246(4).  But elsewhere in Title 18 Congress has defined "bodily injury" to clearly exclude mental harm or by referencing physical injuries.  *See* 18 U.S.C. §§ 249(c)(1), 2266(1). Had Congress always defined "bodily injury" to include impairment of a mental faculty in Title 18, it could be evidence that Congress views "bodily injury" as including purely mental harms. Or, alternatively, it could cut against the Government because the fact that Congress clearly defined "bodily injury" to include mental harm in other statutes but did not do so in § 3663 could be evidence that Congress did not want "bodily injury" to cover purely mental harm.  *See generally Allison Engine Co. v. United States ex rel. Sanders*, 553 U.S. 662, 671 (2008) ("[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (quoting *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002)));  *W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 88–92 (1991) (contrasting the language in 42 U.S.C. § 1988 with similar language in other statutes to help discern the meaning of § 1988).  But Congress has not settled on a uniform definition of "bodily harm" in Title 18, so such inferences are not particularly helpful.

Having concluded that "bodily injury" does not include purely mental harms, we turn to the Government's argument that "bodily injury" includes mental harms that produce physical symptoms.  We agree and hold that "bodily injury" in 18 U.S.C. § 3663  encompasses physical manifestations of mental harms.  In other words, where a victim suffers a mental harm that produces physical symptoms, the victim experiences "bodily injury" for the purposes of § 3663.

As before, we start with the text, which provides that a victim can receive restitution if the defendant commits an "offense resulting in bodily injury to a victim." § 3663(b)(2). Dictionary definitions, as discussed above, show that "bodily injury" means a physical injury to a person's body. When a victim suffers physical manifestations of their mental distress, they have in fact suffered an injury to their corporeal body. And if such physical harm manifests as a "result[]" of the defendant's offense, the physical harm satisfies the clear text of the statute. In addition to being the best reading of the statute's text, this interpretation is in line with Congress's expansive declaration of purpose accompanying the VWPA, which provides that "the purposes of this Act" include "ensur[ing] that the Federal Government does all that is possible within limits of available resources to assist victims and witnesses of crime." Pub. L. No. 97–291, 96 Stat. 1248, 1248–49.

This interpretation is consistent with the approach of the many states that permit recovery for negligent infliction of emotional distress if a plaintiff suffers physical manifestations of their emotional harm, despite retaining the requirement that plaintiffs experience physical harm. *See, e.g.*, Scott D. Marrs, *Mind over Body: Trends Regarding the Physical Injury Requirement in Negligent Infliction of Emotional Distress and "Fear of Disease" Cases*, 28 TORT & INS. L.J. 1, 17–39 (1992); *Gov't Emps. Ins. Co. v. Encelewski*, No. A94-0211 CIV, 1995 WL 25427, at *3 (D. Alaska Jan. 13, 1995) ("The majority of courts find that physical manifestations of emotional distress is a bodily injury." (footnote omitted)), *aff'd*, 94 F.3d 651 (9th Cir. 1996); *Allen v. Wells Fargo, N.A.*, No. CV 14-5283, 2015 WL 5137953, at *6 (E.D. Pa. Aug. 28, 2015); *Walters v. Mintec/Int'l*, 758 F.2d 73, 78 (3d Cir. 1985). We too have recognized that, under Michigan law, a plaintiff may "recover for bodily injury resulting from emotional distress." *Armstrong v. Shirvell*, 596 F. App'x 433, 455 (6th Cir. 2015). And the Second Restatement also treats the physical manifestations of emotional harm as a bodily injury. Restatement (Second) of Torts § 436 (1965) ("The rule . . . applies where the bodily harm to the other results from his shock or fright . . . .").

Courts have also interpreted "bodily injury" in insurance policies to encompass physical manifestations of emotional distress. *See, e.g.*, *Merchants Ins. Co. of N.H. v. Hessler*, No. COV/03-5857, 2005 WL 2009902, at *4 (D.N.J. Aug. 18, 2005) ("It is settled that emotional

distress with physical manifestations is generally covered in the phrase 'bodily injury.'"); *Liberty Mut. Ins. Co. v. Lange*, No. C20-0309, 2023 WL 4704712, at *7 (W.D. Wash. July 24, 2023); *W. Bend Mut. Ins. Co. v. CPT Next Gen, Inc.*, 728 F. Supp. 3d 609, 620–21 (E.D. Mich. 2024), *clarified on denial of reconsideration*, No. 21-CV-10387, 2024 WL 3223916 (E.D. Mich. May 13, 2024).  To be clear, we do not treat state law as providing the contents of the meaning of § 3663, but instead view these cases as evidence of the meaning of "bodily injury" that supports our holding that "bodily injury" includes physical manifestations of mental harm.

Against this conclusion, courts have held that "bodily injury" in Article 17 of the Warsaw Convention does not include physical harm resulting from emotional trauma.  *See Lloyd v. Am. Airlines* (*In re Air Crash at Little Rock Ark., on June 1, 1999)*, 291 F.3d 503, 512 (8th Cir. 2002); *Carey v. United Airlines*, 255 F.3d 1044, 1051–53 (9th Cir. 2001); *Terrafranca v. Virgin Atl. Airways Ltd.*, 151 F.3d 108, 110–111 (3d Cir. 1998).  But in reaching this conclusion, those courts relied heavily on the Supreme Court's reasoning in *Eastern Airlines, Inc. v. Floyd*, in which the Supreme Court held that "bodily injury" in Article 17 of the Warsaw Convention did not include "mental or psychic injuries unaccompanied by physical injury or physical manifestation of injury."  499 U.S. 530, 533, 552–53 (1991).  The *Eastern Airlines* Court relied on "the [original] French text" of the Convention to "guide [its] analysis" along with the "French legal meaning" of the term and French legislation, treatises, and scholarship, and the history of the convention, among other things.  *Id.* at 535–42.  That reasoning makes these cases inapposite because we are interpreting the text of a federal statute, not an international treaty.  Even if *Eastern Airlines* was instructive, our holding is not inconsistent with the opinion—we too hold that "bodily injury" does not include purely mental harms, and *Eastern Airlines* "express[ed] no view as to whether passengers can recover for mental injuries that are accompanied by physical injuries."  *Id.* at 552.

Courts have also held that incarcerated persons cannot bring suits for the physical manifestations of mental harm under the Prison Litigation Reform Act ("PLRA"), but those too are distinguishable based on the text of the PLRA.  The PLRA provides, in relevant part, that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior

showing of physical injury."  42 U.S.C. § 1997e(e).  Courts have held that the PLRA's language requiring a "prior showing of physical injury" means there can be no recovery for physical manifestations of emotional harm.  *Davis v. D.C.*, 158 F.3d 1342, 1349 (D.C. Cir. 1998).  Section 3663, however, has no comparable language.

Despite our agreement with the Government that physical manifestations of mental harm qualify as "bodily injury," it is not clear from the record before us whether the children's mental harm manifested in physical symptoms.  The Government argues that the children suffered from "abdominal pain, headaches, and exacerbated medical conditions."  Appellee Br. at 57.  To support this, the Government cites statements by the children's paternal grandmother.  *See id.* But those statements definitively show only that the children suffered sleeplessness and nightmares as a "result" of Green's crime.  The other physical manifestations discussed, including headaches and abdominal pain, were described as only *potentially* stemming from Green's crime.  *See* R. 108-1 (A.S. Victim Impact Statement at 12) (Page ID #1725) ("Some of these maladies were directly related to the stress of the horrific events and the loss of their parents., [sic] e.g. the sleeplessness and nightmares.  Some may or may not be the direct result of these events.").  There is also no information in the record about how sleeplessness has affected the children physically, or studies showing the impact of sleeplessness on the physical body.  We have suggested in dicta that sleeplessness may be a physical harm or a mental harm.  *See Doe v. Etihad Airways, P.J.S.C.*, 870 F.3d 406, 415 (6th Cir. 2017) (mental); *Meyers v. City of Cincinnati*, 14 F.3d 1115, 1119 (6th Cir. 1994) (physical).  But on the limited record before us, we decline to hold that the children's sleeplessness constituted per se a physical injury.

Given the extremely limited record on this issue, we follow the general rule that "[w]hen an appellate court discerns that a district court has failed to make a finding because of an erroneous view of the law . . . there should be a remand for further proceedings to permit the trial court to make the missing findings."  *Pullman-Standard v. Swint*, 456 U.S. 273, 291 (1982).  We remand for a factual determination of whether the children's mental harm from Green's crime manifested physically, so as to qualify as "bodily injury" under § 3663.  Such physical manifestations may include the children's already cited abdominal pain, headaches, and exacerbated medical conditions if further evidence indicates that any of those symptoms resulted

from Green's crime.  They may also include the children's sleeplessness if further evidence establishes that the children experienced a physical injury through their sleeplessness.

## B.  Hovanec's Appeal

### 1.  Procedural Unreasonableness

Hovanec argues that her sentence is procedurally unreasonable because the district court imposed her sentence "based on clearly erroneous facts" due to its mischaracterization of Dr. Brams's psychological report.  Hovanec Br. at 27.  "A sentence is procedurally unreasonable if, among other things, the district court . . . select[s] a sentence based on clearly erroneous facts." *United States v. Mack*, 808 F.3d 1074, 1084 (6th Cir. 2015) (quoting *Gall v. United States*, 552 U.S. 38, 51 (2007)).  We review a defendant's sentence "for an abuse of discretion," *United States v. Fowler*, 956 F.3d 431, 440 (6th Cir. 2020), and the district court's fact finding for clear error, *Denson*, 728 F.3d at 614.  "The deferential clear-error standard requires us to defer to the district court's finding . . . 'even if we would have made [the] opposite finding,' so long as both [findings] are plausible on the record as a whole."  *United States v. Estrada-Gonzalez*, 32 F.4th 607, 614 (6th Cir. 2022) (quoting *United States v. Caston*, 851 F. App'x 557, 560 (6th Cir. 2021)).[3]  A defendant's sentence is based on clearly erroneous facts if the district court "relie[d] upon 'erroneous information'" and "the information in question appears to have been 'an important factor in determining [the] sentence.'"  *United States v. Cunningham*, 669 F.3d 723, 730 (6th Cir. 2012) (quoting *United States v. Wilson*, 614 F.3d 219, 224 n.3 (6th Cir. 2010)).  To analyze whether the erroneous information was an important factor in the district court's sentencing determination, we consider whether the sentence "might have been different in the absence of that information."  *Wilson*, 614 F.3d at 224 n.3 (citation modified).

---

[3]The government argues that Hovanec failed to object to her sentence on the ground that the district court mischaracterized Dr. Brams's report, so we should review for plain error.  Appellee Br. at 60.  This argument has merit as to Hovanec's procedural-reasonableness claim.  Despite this, we analyze Hovanec's procedural-reasonableness arguments under the clear-error standard articulated above because the outcome would be same under either standard, and her substantive-reasonableness argument rises and falls on the same argument, *see* Hovanec Br. at 32 ("The district court imposed a substantively unreasonable sentence for these same reasons."), which is not reviewed for plain error.

Hovanec argues that the district court erred in finding that the information in Dr. Brams's report was unsubstantiated because Dr. Brams, as a mental-health professional, "corroborated" Hovanec's claims about her mental health and Hovanec's sisters, Jill and Samantha, corroborated Hovanec's account of childhood abuse. *See* Hovanec Br. at 27–30. Hovanec's argument, however, is based on a strained reading of the sentencing transcript—the district court never stated that it believed the report was unsubstantiated. Hovanec's argument, therefore, is based entirely on the district court's statements that it viewed the report with skepticism because it "agreed more than . . . disagreed with [the Government's] arguments" as to why the report was not reliable. *Id.* at 28; R. 163 (Hovanec Sent'g Tr. at 209:23–210:6) (Page ID #3705–06).

The Government stated in passing at Hovanec's sentencing hearing that "nothing in [the report] was substantiated." R. 163 (Hovanec Sent'g Tr. at 203:3–5) (Page ID #3699). But a full review of the record shows that the Government explicitly acknowledged that two of Hovanec's five sisters informed Dr. Brams that they grew up in an abusive household and the Government never contested that Dr. Brams was a mental-health professional. *Id.* at 202:18–25 (Page ID #3698) ("She gives credence to the statements that Ms. Hovanec makes [about the abuse in her childhood] because she corroborated it by talking with two of her five sisters."). Given that the Government explicitly acknowledged the statements of Hovanec's sisters and did not challenge that Dr. Brams was a mental-health professional, we are unpersuaded that we should read the district court's tendency to agree with the Government's arguments as endorsing the erroneous view that nothing in the report was substantiated.

Our conclusion is supported by the other valid critiques of the report that the Government presented at sentencing. For example, the Government accurately pointed out that there was "no independent, objective, or reliable testing noted in the report" and that the report did not state that Dr. Brams "considered any medical records, any school records, other psyche records, et cetera." *Id.* at 202:10–17 (Page ID #3698). Even though Dr. Brams discussed diagnostic criteria as related to certain of Hovanec's diagnoses, most notably her conclusion that Hovanec suffers from PTSD, the report does not state that she conducted any standardized psychological testing and noted that "[t]he purpose of this evaluation [was] not to necessarily provide a formal psychiatric/mental health diagnoses [sic]." R. 128-2 (Dr. Brams Report at 17) (Page ID #2569).

The Government also accurately noted that Dr. Brams "g[ave] credence" to Hovanec's reported childhood abuse "because [Dr. Brams] corroborated it by talking with two of her five sisters," but that the report did not state whether Dr. Brams was aware that one of the sisters she interviewed "was present on Friday, April 22nd, 2024, in the kitchen of the Green residence where Ms. Hovanec announced her intent to kill [T.H.]." R. 163 (Hovanec Sent'g Tr. at 202:20–203:2) (Page ID #3698–99). The Government then provided evidence that potentially undermined aspects of the sisters' accounts of abuse. One of Hovanec's sisters stated that "the only way the gross physical violence in the home was moderated [was] when the police were called," which implies that the police were called to the home more than once. R. 128-2 (Dr. Brams Report at 5) (Page ID #2557). The Government, however, presented evidence that its investigation into county records dating back to the 1980s had uncovered only one police report regarding abuse in Hovanec's household. R. 163 (Hovanec Sent'g Tr. at 126:19–128:2) (Page ID #3622–24). It is certainly true, as Hovanec's counsel argued at sentencing, that abuse often goes unreported. But given that the sister's statement implied that the police came to the family home more than once, the existence of only one such report could have undermined the district court's trust in Hovanec's sister.

The Government next discussed Hovanec's allegations that T.H. abused their children, which Dr. Brams relayed as Hovanec's motive for the murder. R. 128-2 (Dr. Brams Report at 13, 15–16) (Page ID #2565, 2567–68). The Government cited testimony from a law-enforcement agent who "ran [the abuse allegations] to ground," including interviewing people and flying overseas, but did not find any evidence that substantiated the allegations that T.H. was abusive. R. 163 (Hovanec Sent'g Tr. at 203:6–20) (Page ID #3699). The Government also pointed out that Hovanec told Dr. Brams that she grew up in poverty and lived in a "single wide trailer" "[f]or most of her life." *Id.* at 204:9–204:17 (Page ID #3700); R. 128-2 (Dr. Brams Report at 4) (Page ID #2556). Despite this, property records showed that Green's home, where the murder took place, was purchased in 1994, when Hovanec was approximately six or seven years old. *Id.* at 204:9–204:17 (Page ID #3700). The record showed that in 1994 there was a "one-story frame home" on the property. *Id.* The Government also correctly argued that the home was captured on the dashcam footage, which shows that the home is not a single-wide trailer. *Id.*; 4/24/2022 Dashcam Footage 19:00–19:01. Hovanec did not rebut this evidence.

The Government's arguments and corresponding evidence undermined information Hovanec provided to Dr. Brams and potentially called into question the credibility of one of Hovanec's sisters.  Therefore, the district court had valid reasons to be concerned that Dr. Brams may have unknowingly relied on inaccurate information from Hovanec.  Even though Dr. Brams also reviewed some documents, much of the information in the report came from Hovanec.  In the end, the weight the court should have given the "psychological report" is "subject to varying interpretation[s]," so the district court's position does not "rise[] to the level of being clearly erroneous."  *United States v. Robinson*, 669 F.3d 767, 774 (6th Cir. 2012); *see also United States v. Dalasta*, 3 F.4th 1121, 1126 (8th Cir. 2021) ("The district court has discretion to weigh the credibility and cogency of expert opinions.  Something more than disagreement with the court's credibility determination is needed to show that the court committed clear error." (internal citation omitted)).

Resisting this conclusion, Hovanec argues that the district court committed clear error because it mischaracterized the nature and source of Hovanec's mitigating evidence.  Hovanec Br. at 30.  True, we have held that a district court committed clear error when it attributed testimony to one witness when it in fact came from another.  *United States v. Knight*, 756 F. App'x 571, 575 (6th Cir. 2018).  That, however, is not what occurred here.  The Government pointed to valid reasons to be concerned about the accuracy of the information in the Brams report and, despite its statements that nothing in the report was substantiated, honestly acknowledged that Hovanec's sisters had corroborated her accounts of childhood abuse.[4]

Hovanec next argues that the district court erred in its consideration of Dr. Brams's report for a second reason—the district court described Dr. Brams as a "hired advocate."  Hovanec argues that this characterization was clearly erroneous because the report stated that Dr. Brams "was retained for her time and expertise and not to provide any predetermined opinions regarding this legal matter."  Hovanec Br. at 31 (quoting R. 128-2 (Dr. Brams Report at 1–2)

---

[4]It certainly would have been preferable for the district court to have explained more clearly why it viewed Dr. Brams's report with skepticism, rather than stating only it agreed more than disagreed with the government's arguments.  Perhaps the lack of explanation could have been a reason Hovanec's sentence was procedurally unreasonable.  *See Mack*, 808 F.3d at 1084.  Ultimately, however, we express no view on that question because Hovanec does not argue that the district court's decision was erroneous on that basis.

(Page ID #2553–4)).   Even assuming that it was erroneous to describe Dr. Brams as a "hired advocate," nothing in "the record here suggests that the district court . . . consider[ed] the erroneous fact important to its sentencing determination." *United States v. Parks*, No. 22-3678, 2023 WL 4543486, at *5 (6th Cir. July 14, 2023).   The district court ultimately granted Hovanec a downward variance at sentencing because of her history and characteristics, and when discussing the report stated that "[i]t[] [was] also hard for [the court] not to fathom that there were at least a few missing pieces in Ms. Hovanec's life coming up to get her to where she was." R. 163 (Hovanec Sent'g Tr. at 210:2–5) (Page ID #3706).

The district court stated that it viewed Dr. Brams's report with skepticism based on the arguments the Government had presented.   *Id.* at 209:23–210:6 (Page ID #3705–06).   The Government never argued that Dr. Brams was a "hired advocate," but instead presented other grounds to discount the report, as described above.   The record, therefore, does not reflect that the district court's passing statement that Dr. Brams was a hired advocate was "important to its sentencing determination," because it was not one of the bases the Government presented to discount the report.   *Parks*, 2023 WL 4543486, at *5.   Instead, this case is analogous to *Cunningham*.   In *Cunningham*, the defendant argued that the court relied on clearly erroneous evidence at sentencing by considering recidivism studies that suggested the defendant had a high likelihood of recidivism and rejecting studies that suggested the defendant was unlikely to reoffend.   669 F.3d at 730–31.   We held that the district court's reliance on the studies was not clear error because the district court relied on them in only a limited manner and explained that other factors also caused it to be concerned that the defendant was likely to reoffend.   *Id.*   Here, the record indicates that the district court discounted the report for the reasons that the Government presented, the Government presented other valid reasons to do so, and that the Government did not argue that Dr. Brams was a hired advocate.   Therefore, the district court's passing characterization of Dr. Brams as a hired advocate was not "important to its sentencing determination." *Parks*, 2023 WL 4543486, at *5.

## 2.  Substantive Reasonableness

Hovanec argues that her sentence was substantively unreasonable because the court gave too little weight to her history and characteristics due to its view of Dr. Brams's report.   Hovanec

Br. at 32–33.  We review the substantive reasonableness of a defendant's sentence for an abuse of discretion. *United States v. Tristan-Madrigal*, 601 F.3d 629, 632 (6th Cir. 2010).  "A sentence is substantively unreasonable if the sentencing court . . . failed to consider pertinent § 3553(a) factors[] or gave an unreasonable amount of weight to any pertinent factor." *Cunningham*, 669 F.3d at 733.  If a defendant's sentence is within the guidelines range, their sentence is presumptively reasonable.  *Tristan-Madrigal*, 601 F.3d at 633.  If the defendant received a downward variance, the task of persuading us that the sentence was unreasonably long "is even more demanding."  *United States v. Lynde*, 926 F.3d 275, 279 (6th Cir. 2019) (quoting *United States v. Curry*, 536 F.3d 571, 573 (6th Cir. 2008)).

Hovanec's brief argument does not overcome the presumption.  Our analysis focuses, as all substantive-reasonableness challenges do, on whether Hovanec's sentence was too long.  *See Tristan-Madrigal*, 601 F.3d at 632–33 ("The essence of a substantive-reasonableness claim is whether the length of the sentence is 'greater than necessary.'").  Hovanec's argument that the district court gave too little weight to her history and characteristics is belied by the record.  The district court granted Hovanec a downward variance from the guideline life sentence based on her history and characteristics.  The district court noted that Hovanec did not have any criminal history, R. 163 (Hovanec Sent'g Tr. at 209:17) (Page ID #3705), and ultimately found that a life sentence was not warranted because the court was not "utterly convinced that there is nothing about her that could possibly be redeemed," *id.* at 210:21–24 (Page ID #3706).  When discussing Dr. Brams's report, the district court stated that it was "hard for [the court] not to fathom that there were at least a few missing pieces in Ms. Hovanec's life" growing up that contributed to the commission of her crimes, demonstrating that the court believed that the report in fact provided some information about Hovanec's past.  *Id.* at 210:2–5 (Page ID #3706).  These statements clearly show that the district court considered Hovanec's history and characteristics to Hovanec's benefit.

The downward variance to 480 months from a life sentence may not have been as large as Hovanec would have preferred, but there were other factors that counseled against a further reduction.  The district court explained that the need to impose "punishment fitting the crime" and "public deterrence" were factors that weighed heavily in favor of not granting a larger

downward variance. *Id.* at 211:5–20 (Page ID #3707). The nature of the offense, which involved the "cold blood[ed][] murder [of] the father of [her] children" that was "premeditated," "thought out," and "carefully executed" also weighed against a greater variance. *Id.* at 209:3–22 (Page ID #3705). Ultimately, it was "reasonable . . . for the district court to have given significant weight to general deterrence and retribution when sentencing [Hovanec] in light of" the nature of the offense here. *United States v. Sexton*, 512 F.3d 326, 332 (6th Cir. 2008); *cf. Vonner*, 516 F.3d at 390 (holding that the defendant did not overcome the presumption of reasonableness when, despite evidence that Vonner "had a 'rather poor childhood,'" there was sufficient evidence that "the need for public protection and the risk of recidivism were great").

### 3. Aggravating-Role Enhancement

Hovanec argues that the district court erred in applying the two-level sentencing enhancement in U.S.S.G. § 3B1.1(c) for her aggravating role in the offense. *See* Hovanec Br. at 33–38. Hovanec's PSR suggested applying a two-level aggravating role enhancement under U.S.S.G. § 3B1.1(c) to Hovanec because she was "an organizer, leader, manager, or supervisor" of the criminal activity that was not covered by § 3B1.1(a) or (b) because she "directed Theodorou and Green as to the killing of T.H. and the covering up of the crime." Hovanec PSR ¶ 32. Presumably the criminal activity here was not covered by § 3B1.1(a) or (b) because it involved fewer than five participants and was not "otherwise extensive." U.S.S.G. § 3B1.1(a), (b).

The district court ultimately applied the two-level aggravating role enhancement under § 3B1.1(c) and found that Hovanec "exercise[d] decision-making authority," "recruit[ed] accomplices," "[r]eceived a larger share of the profits," and "exercised some emotional control over Theodorou." R. 163 (Hovanec Sent'g Tr. at 157:9–158:4) (Page ID #3653–54). The district court based its finding that Hovanec exercised a degree of control over Theodorou on text messages between Hovanec and Theodorou that showed Hovanec directed Theodorou to meet with the third hitman, Hovanec's statement that she made Green and Theodorou participate in the crime, and the fact that Theodorou would not have participated in the crime absent Hovanec's direction. *Id.* at 144:12–19, 146:12–14, 147:2–5 (Page ID #3640, 3642, 3643). The district court did not clearly state whether it found that Hovanec was an organizer, leader, manager, or

supervisor, but the court stated that "looking at the *Minter* case, . . . the government has established by a preponderance several of the factors, if not all of the factors." *Id.* at 157:11–14 (Page ID #3653). *United States v. Minter* addressed an enhancement under U.S.S.G. § 3B1.1(c) for the defendant's status as a manager, not a leader. 80 F.4th 753, 757–60 (6th Cir. 2023). That suggests that the district court may have found that Hovanec was a manager, but it is not entirely clear. The Government argues before us that Hovanec was a leader. Appellee Br. at 65.[5] Given the lack of clarity as to whether the district court found that Hovanec was a manager or leader and the Government's position before us, we review the district court's findings to determine if they satisfy the higher standard required to show leadership.

We "review[] 'the district court's legal conclusion that a person is an organizer or leader under [§] 3B1.1 deferentially, and its factual findings for clear error.'" *United States v. Nicolescu*, 17 F.4th 706, 724 (6th Cir. 2021) (quoting *Sexton*, 894 F.3d at 794). "Under the clear-error standard, we abide by the court's findings of fact unless the record leaves us with the definite and firm conviction that a mistake has been committed." *Sexton*, 894 F.3d at 794 (quoting *United States v. House*, 872 F.3d 748, 751 (6th Cir. 2017)). "[Our] deferential review of the district court's ultimate legal conclusion is based on the recognition that the 'trial judge is most familiar with the facts and is best situated to determine whether someone is or is not a "leader" of a conspiracy that the jury found existed.'" *Nicolescu*, 17 F.4th at 725 (quoting *United States v. Washington*, 715 F.3d 975, 983 (6th Cir. 2013)).

Section 3B1.1 of the guidelines provides that the defendant's offense level may be increased based on their role in the enhancement in three scenarios:

> **(a)** If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.
>
> **(b)** If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.

---

[5]The Government's sentencing memorandum discussed the application of the enhancement under U.S.S.G. § 3B1.1(c), but did not clearly state whether Hovanec was a leader or manager. *See* R. 129 (Gov't Sent'g Mem. at 5–7) (Page ID #2603–05).

> **(c)** If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in subsection (a) or (b), increase by 2 levels.

U.S.S.G. § 3B1.1(c); *Nicolescu*, 17 F.4th at 725.  To determine whether the defendant was an organizer or leader, as opposed to "mere[ly]" a manager or supervisor, courts consider:

> the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1 cmt. n.4.  A court need not find all these factors satisfied for the enhancement to apply.  *Sexton*, 894 F.3d at 794.  As Hovanec correctly points out, however, "[t]o qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants," not the criminal activity itself.  U.S.S.G. § 3B1.1, cmt. n.2; *see also United States v. Kamper*, 748 F.3d 728, 748 (6th Cir. 2014) ("To qualify for this enhancement, a defendant must have managed or supervised 'one or more other participants,' and not merely the criminal scheme." (quoting U.S.S.G. § 3B1.1(b) cmt. n.2)).

We have upheld the application of this enhancement based on the defendant's leadership role when the defendant directed members of the criminal activity to pick up drugs at a certain location, guided them to distribute the drugs, and recruited accomplices.  *United States v. Taylor*, 85 F.4th 386, 390–91 (6th Cir. 2023); *see also United States v. Vasquez*, 560 F.3d 461, 473 (6th Cir. 2009) (affirming a finding that the defendant was a leader based on the defendant's negotiation of drug prices with an undercover agent, "his knowledge and involvement in the details of the transaction, his position as a supplier to others, and his authority over his brother"); *Nicolescu*, 17 F.4th at 724 (affirming a finding that the defendant was a leader when the defendant "created the computer virus, recruited the money mules, instructed the mules to divide the wire transfers into increments below $3,000 to avoid detection, and kept 25% of the profits").  The district court here found that Hovanec "exercise[d] decision-making authority," "recruit[ed] accomplices," "[r]eceived a larger share of the profits," and "exercised some emotional control over Theodorou."  R. 163 (Hovanec Sent'g Tr. at 157:9–158:4) (Page ID #3653–54).  Under our

caselaw, those findings are sufficient to sustain the application of the two-level enhancement for Hovanec's leadership role in the offense.

Against this conclusion, Hovanec argues that the district court erred in finding that Hovanec exercised a degree of control over Theodorou.  Hovanec Br. at 33–34.[6]  First, she argues that the district court should not have considered her statement during an interview with law enforcement that she made Green and Theodorou "do it," in reference to their participation in the crime, because she provided other "inaccurate" information in the interview.  *See* Hovanec Br. at 34.  Generally, "[a]ny question as to the truth of the evidence is an underlying credibility issue . . . appropriate for the district court" to determine, and therefore the district court's determination is entitled to great deference.  *Washington*, 715 F.3d at 983; *see also United States v. Prigmore*, 15 F.4th 768, 777 (6th Cir. 2021) (holding that when reviewing for clear error, this court "give[s] 'great deference to the district court's credibility determinations.'" (quoting *United States v. Johnson*, 344 F.3d 562, 567 (6th Cir. 2003))).  It is true that some of Hovanec's statements to investigators during that interview were inaccurate.  For example, Hovanec initially said that she received the etorphine from a man in Columbus, not Theodorou.  R. 129-5 (April 27, 2022, Hovanec Interview Tr. at 83:18–84:19) (Page ID #2817–2818).  Some of the statements she made to investigators in the interview, however, were accurate.  For example, Hovanec admitted that she had "wiped down the steering wheel" of T.H.'s car and took "his phone, the license plate from the car and the other personal belongings of [T.H.'s] and . . . threw those away."  R. 163 (Hovanec Sent'g Tr. at 124:9–14) (Page ID #3620).  Given that some of Hovanec's statements during the interview were accurate and the deferential nature of our review, the district court did not clearly err in considering this admission from Hovanec.

Second, Hovanec contends that she did not exercise a sufficient degree of control or authority over Theodorou because he independently engaged in criminal activity.  *See* Hovanec Br. at 35.  Hovanec points out that Theodorou talked to the potential hitmen, paid one potential

---

[6]Hovanec did not argue in her opening brief that any of the district court's other findings were erroneous. In her reply brief, however, Hovanec challenged the district court's conclusion that Hovanec would presumably have received a larger share of the profits of the crime because she was still married to T.H. and would have gotten custody of the children.  Hovanec Reply Br. at 16; R. 163 (Hovanec Sent'g Tr. at 157:18–22) (Page ID #3653). Because Hovanec did not challenge that aspect of the district court's decision in her opening brief, the argument is forfeited.  *See Scott v. First S. Nat'l Bank*, 936 F.3d 509, 522 (6th Cir. 2019).

hitman, arranged to receive the etorphine, shipped the etorphine to the United States, paid for the shipment, told Green and Hovanec he did not believe burying T.H. in a pond was a good idea, and helped load T.H.'s body into the car and bury him, among other things. *Id.* at 35–36.  It makes little difference, however, that Theodorou at times played a more active role because engaging in some limited independent activity does not undermine that Hovanec was a leader or organizer. *Cf. Sexton*, 894 F.3d at 796 (holding that the defendant may still have been a "leader" even though another defendant "may have been the actual brains behind the operation").  And that Theodorou engaged in some of the criminal activity in South Africa does not show the district court clearly erred in finding Hovanec was a leader because a defendant can lead others even when they are not physically with them. *See United States v. Holliday*, 69 F.3d 538, 1995 WL 641294, at *5 (6th Cir. 1995) (table) (per curiam); *cf. United States v. Davis*, 809 F.2d 1194, 1204 (6th Cir. 1987) (holding that a jury could conclude that the defendant organized, managed, or supervised five people involved in a drug operation for purposes of 21 U.S.C. § 848, including one person based in the Netherlands).

Additionally, there is evidence that Hovanec directed Theodorou, via their communications, to undertake much of his activity in South Africa.  Under our caselaw, that is sufficient to show the defendant exercised the requisite degree of authority or control for the leadership enhancement.  We have held that a defendant exercised a sufficient degree of authority or control over others when the defendant directed another person to undertake a certain activity, which that person did, without any coercion, threats, or other evidence of control. *Vasquez*, 560 F.3d at 464–65, 473.  The evidence of control or authority in this case includes Theodorou's statements that it was Hovanec's idea to hire a hitman and that he tried to find a hitman at the "direct[ion]" of Hovanec.  R. 163 (Hovanec Sent'g Tr. at 53:16–22, 56:18–57:1) (Page ID #3549, 3552–53).  The evidence also includes Hovanec's texts to Theodorou, which corroborate that Theodorou undertook certain activity at the direction of Hovanec.  Hovanec asked Theodorou to "promise" that he would meet with the third potential hitman "even if [she was] not there." *Id.* at 61:13–15 (Page ID #3557).  Theodorou responded that he "[couldn't] make that promise" "[b]ecause [he] d[id not] want to go if [Hovanec was] not here." *Id.* at 61:16–62:2 (Page ID #3557–58).  Hovanec directed him to meet with the potential hitman because "[she] want[ed] to know if [hiring him] [was] possible." *Id.* at 62:5–12 (Page ID

#3558).  These messages corroborate that without Hovanec's direction, Theodorou would not have met with the third hitman.

Hovanec directed the shipment of etorphine, too.  Hovanec told Theodorou to ship the etorphine from South Africa to the United States via DHL, and when DHL informed Theodorou it would not ship liquids, Hovanec told him to "conceal it within something else" in the package and not include it on "the manifest."  *Id.* at 55:22–56:17 (Page ID #3551–52).  True, Theodorou paid for the cost of shipping the etorphine, but Theodorou did so only because Hovanec "told him to."  *Id.* at 105:10–16 (Page ID #3601).[7]  All of this supports the district court's finding that Hovanec exercised a degree of authority or control over Theodorou sufficient to support a finding that Hovanec was a leader even though Theodorou was physically in South Africa when he undertook some of the criminal activity.[8]

Finally, Hovanec argues that the district court's erroneous view of Dr. Brams's report infected the leadership analysis because the report stated that Hovanec had limited emotional functioning and deficits in "reasoning, reality testing, and coping skills," which shows she could not control Theodorou.  Hovanec Br. at 37–38.  We have already determined that the district court's treatment of Dr. Brams's report was not clear error.  And even though Dr. Brams's statements may have suggested some limitations on Hovanec's ability to be a leader, there is also ample evidence to the contrary, as discussed above, that shows that Hovanec was in fact a leader.  Therefore, the district court did not commit clear error.  *Hinojosa*, 606 F.3d at 882 ("'Where there are two permissible views of the evidence,' the district court does not clearly err in accepting one interpretation over the other."  (quoting *Navarro-Camacho*, 186 F.3d at 708)).

In the end, the district court's findings are not clearly erroneous and support its determination that Hovanec was a leader for purposes of the two-level enhancement under U.S.S.G. § 3B1.1(c).

---

[7]Hovanec also points out that Theodorou paid the second potential hitman.  But again, Theodorou said he did so only because Hovanec told him to.  R. 163 (Hovanec Sent'g Tr. at 105:10–16) (Page ID #3601).

[8]Hovanec also argues that her romantic relationship with Theodorou alone could not justify a finding of control.  Hovanec Br. at 36.  That is certainly true, *see United States v. Ross*, 216 F.3d 1089, 2000 WL 702385, at *4 (10th Cir. 2000) (table), but the evidence here goes beyond their "relationship alone" to establish leadership.

### 4. Obstruction-of-Justice Enhancement

Hovanec argues that the district court erred in applying an enhancement for obstruction of justice because the investigation was not "slowed down by" her actions and so she did not obstruct justice "[a]s a practical matter." Hovanec Br. at 38–40. The Sentencing Guidelines provide that a defendant may receive a two-level enhancement at sentencing if they "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and . . . the obstructive conduct related to . . . the defendant's offense of conviction and any relevant conduct." U.S.S.G. § 3C1.1. When a defendant adequately preserved their objection to the application of this enhancement, we review the district court's factual findings for clear error, and its legal conclusions de novo. *United States v. Histed*, 93 F.4th 948, 960 (6th Cir. 2024). The standard of review this court should apply when considering the application of facts to the guidelines is less clear and may be either de novo or clear error. *Thomas*, 933 F.3d at 608.[9] We need not resolve that question here because Hovanec's arguments would fail under either standard.

The district court's determination that Hovanec obstructed justice is supported by the record. The district court found that Hovanec obstructed justice by (1) placing T.H.'s belonging in various dumpsters, (2) driving T.H.'s car to Dayton and abandoning it in a bad part of town to "stag[e] a carjacking," (3) disposing of the syringe and bottle of etorphine used to kill him, (4) lying to investigators about where the etorphine came from and where T.H. was buried, and (5) sending a message to T.H.'s phone after she was interviewed by police that said the police were looking for him and he should contact them. R. 163 (Hovanec Sent'g Tr. at 21:9–14, 120:1–21, 149:9–24, 158:16–159:4) (Page ID #3517, 3616, 3645, 3654–55). Most of these findings relate to the destruction of evidence. Arguably, Hovanec's message to T.H. could be analogized to the production of false documents or records. Neither of those factors outlined in the guidelines require that the obstruction actually hinder the investigation. U.S.S.G. § 3C1.1 cmt. n.4(C)–(D); *Thomas*, 933 F.3d at 610.

---

[9]Recently, we held that we "review . . . perjury-based obstruction enhancements" for clear error. *United States v. Jackson*, 154 F.4th 422, 427–28 (6th Cir. 2025).

Hovanec points out that the investigation used cell-phone location data to find T.H.'s car and that the dashcam captured his death, resulting in "[a]ll three defendants" being in "custody within 24 hours of the FBI opening its investigation." Hovanec Br. at 39. This enhancement, however, can apply even when the defendant attempted, but failed, to destroy evidence. For example, in *United States v. Van Shutters*, 163 F.3d 331 (6th Cir. 1998), the defendant requested that another person destroy evidence related to a scheme of using forged checks to purchase vehicles after his arrest. The third party did not actually destroy the evidence and one of the victims of the scheme identified the defendant as the perpetrator, but we nevertheless held the enhancement was applicable. *Id.* at 334, 339–40; *see also United States v. Waldon*, 206 F.3d 597, 608–09 (6th Cir. 2000) (affirming application of the enhancement when the defendant asked another person to report the car used in the commission of the crime as stolen after his arrest, but they did not do so); *United States v. Schwartz*, 698 F. App'x 799, 803 (6th Cir. 2017) (affirming application of the enhancement when the defendant asked Google to delete his account to destroy evidence of child-sexual-abuse materials despite the lack of actual obstruction of the investigation).

To be sure, *Van Shutters* and *Waldon*—and the guideline's application notes—indicate that the obstruction-of-justice enhancement is more often warranted when the defendant's obstructive conduct occured after they were already under investigation. *See* U.S.S.G. § 3C1.1 cmt. nn.1 & 4. Much of Hovanec's conduct occurred before law enforcement began their investigation. Nevertheless, the guidelines provide that if the "[o]bstructive conduct . . . occurred prior to the start of the investigation" the enhancement may still apply "if the conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction." *Id.* § 3C1.1 cmt. n.1. Hovanec does not argue that the district court erroneously found that the obstruction was "purposefully calculated[] and likely to[] thwart the investigation." Moreover, the district court stressed that Hovanec texted T.H.'s phone *after* the investigation was underway—which was a "really clear, affirmative act" to "throw the[] [investigators] off the scent." R. 163 (Hovanec Sent'g Tr. at 149:12–24) (Page ID #3645). Based on her extensive efforts to avoid detection, both before and after law enforcement began investigating, we find no clear error in the district court's decision to apply the enhancement.

Hovanec next argues that the court erred because it predetermined that this enhancement applied to her based on the court's statement that it "really never had any doubt" about the enhancement. Hovanec Br. at 39–40; R. 163 (Hovanec Sent'g Tr. at 158:5–7) (Page ID #3654). This violated Federal Rule of Criminal Procedure 32(i)(4)(A)(i)–(ii), the argument goes, because Rule 32 requires that the district court give the defendant's attorney "an opportunity to speak on the defendant's behalf" and permit "the defendant to speak or present any information to mitigate the sentence." Hovanec Br. at 39–40. We have held that Rule 32(i) was not violated when a district court told the defendant that it would impose the maximum sentence possible before the sentencing hearing because the district court reviewed the underlying materials, heard arguments from both parties, and sufficiently explained its decision at sentencing. *United States v. Glass*, 749 F. App'x 434, 440–41 (6th Cir. 2018); *United States v. Epps*, 655 F. App'x 444, 449 (6th Cir. 2016). Such statements are more indicative of predetermination than the district court's statement here. We have also held that district courts may draft a sentencing opinion prior to the sentencing hearing as long as the parties are given the opportunity to be heard and present arguments. *Cunningham*, 669 F.3d at 728–30.

The record reflects that the court considered the arguments of both parties before imposing a sentence and made clear findings based on the evidence before it. The sentencing transcript spans 154 pages before the district court determined the enhancement applied to Hovanec. R. 163 (Hovanec Sent'g Tr. at 4:1–158:5) (Page ID #3500–3654). Hovanec's counsel had the ability to, and did, present arguments on the obstruction enhancement. *Id.* at 148:16–151:5 (Page ID #3644–47). Hovanec cites nothing in the record that shows she wanted more time at the hearing to address this issue. Additionally, the court explicitly acknowledged arguments made by Hovanec's counsel when announcing its decision. *Id.* at 158:9–11 (Page ID #3654). The district court did not impermissibly predetermine the applicability of the obstruction enhancement.

Finally, Hovanec argues that the district court erred because it erroneously cited a case that does not address obstruction of justice when announcing its determination that the enhancement applied. Hovanec Br. at 38–40. The district court stated "that the [G]overnment has established, for several of the reasons under *Minter*, the enhancement for obstruction." *Id.* at

40 (quoting R. 163 (Hovanec Sent'g Tr. at 159:4–6) (Page ID #3655)).  It is true that *Minter* addresses the aggravating-role enhancement but does not address obstruction of justice.  80 F.4th at 758.  But Hovanec did not object before the district court on this ground.  Instead, she objected to the application of the obstruction enhancement on other grounds.  *See* Hovanec Reply Br. at 18 (citing R. 163 (Hovanec Sent'g Tr. at 148:16–152:1) (Page ID #3644–48)).  Those other objections did not "adequately apprise[] the trial court of the true basis for [the] objection" she now raises.  *United States v. Bostic*, 371 F.3d 865, 871 (6th Cir. 2004) (quoting *United States v. LeBlanc*, 612 F.2d 1012, 1014 (6th Cir. 1980)).  Therefore, we review for plain error.  *Id.*

We have held that district courts do not commit reversible error when they fail to cite the relevant guidelines as long as "the totality of the record shows that" the relevant factors were considered.  *United States v. Harmon*, 607 F.3d 233, 239 (6th Cir. 2010); *see also United States v. Potts*, 947 F.3d 357, 367 (6th Cir. 2020) (holding that the district court did not plainly err by failing to mention the relevant guidelines provision when the district court assessed the relevant factors).  Our sibling circuits have similarly held that a district court did not commit reversible error when the district court misspoke when stating the relevant standard once but correctly articulated the standard elsewhere because the error was just a "slip of the tongue."  *United States v. Grimes*, 225 F.3d 254, 259–60 (2d Cir. 2000).  The totality of the record here shows that the district court considered the relevant factors and that the invocation of *Minter* was a "slip of the tongue."  The district court correctly cited the obstruction-of-justice section of the guidelines and correctly stated the legal standard.  R. 163 (Hovanec Sent'g Tr. at 21:1–14) (Page ID #3517).  The district court also considered legally relevant conduct when determining that the enhancement applied.  *Id.* at 158:5–159:4 (Page ID #3654–55).  Immediately before determining that the obstruction enhancement applied, the district court found that the aggravating-role-enhancement applied and correctly invoked *Minter* for that purpose.  *Id.* at 157:9–14 (Page ID #3653).  That timing further suggests that the district court's error was merely a slip of the tongue.  Because the record as a whole demonstrates that the district court considered the relevant factors for the obstruction enhancement, this citation error does not warrant reversal.

### III.  CONCLUSION

For the foregoing reasons, we **AFFIRM** Green's and Hovanec's sentences.  We **REVERSE** Green's order of restitution and **REMAND** for further proceedings consistent with our holdings that emotional harm alone does not constitute "bodily injury" under 18 U.S.C. § 3663(b)(2), but that emotional harm caused by the defendant's offense that manifests in physical symptoms qualifies as "bodily injury" for purposes of the statute.